DiLiddo v. Oxford Street Realty, Inc.

LORI DiLIDDO vs. OXFORD STREET REALTY, INC., & another.[1]

Middlesex. September 5, 2007. - November 15, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Practice, Civil,* Summary judgment. *Housing. Landlord and Tenant,* Discrimination, Handicapped person. *Statute,* Construction. *Transitional Living. Words,* "Requirement."

In a civil action where the plaintiff, a recipient of a housing subsidy under the alternative housing voucher program (AHVP), alleged that a landlord's refusal to rent her an apartment unit in a certain building — based on the landlord's perception that the one-month termination provision in the standard form lease provided by the subsidizing agency was economically disadvantageous — constituted discrimination in violation of G. L. c. 151B, § 4 (10), the Superior Court judge erred in entering summary judgment in favor of the defendants, the property manager of the relevant building, where the objected-to lease termination provision was a "requirement," for purposes of G. L. c. 151B, § 4 (10), of the AHVP [73-77], and where the clear terms of that statute did not provide an exception that would allow landlords to reject a participant in a housing subsidy program whose requirements could cause the landlord substantial economic harm [77-78].

In a housing discrimination action under G. L. c. 151B, § 4 (10), an apartment building's property manager and its principal, who were directly responsible for locating, interviewing and choosing tenants for the building, were liable for refusing to sign the standard form lease pertaining to the plaintiff's alternative housing voucher, where any duty that the property manager and the principal owed to the owner of the building was superseded by their duty to comply with the law [78-79]; moreover, acting on the advice of counsel was not a defense to a claim under G. L. c. 151B, § 4 (10) [79-80].

CIVIL ACTION commenced in the Superior Court Department on November 24, 2003.

The case was heard by *Christine M. McEvoy,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Zaheer A. Samee (Robert G. Burdick* with him) for the plaintiff.

[1]Jeffrey W. Indeck.

*Christian G. Samito* for the defendants.

The following submitted briefs for amici curiae:

*Jane E. Willis, Chanel R. Dalal, James W. Cobb, & Nadine Cohen* for The Fair Housing Center of Greater Boston, Inc.

*Caitlin A. Sheehan* for Massachusetts Commission Against Discrimination.

*Susan Ann Silverstein & Michael Schuster,* of the District of Columbia, *& Jonathan Mannina, Faye Rachlin, & Alan Jay Rom* for AARP & another.

*Martha Coakley,* Attorney General, *& Maura T. Healey & Zoë Stark,* Assistant Attorneys General, for the Commonwealth.

MARSHALL, C.J. Massachusetts law prohibits landlords from discriminating against tenants who receive public housing subsidies either "because the individual is such a recipient," or "because of any requirement" of the subsidy program. G. L. c. 151B, § 4 (10).[2] We consider in this case whether, consistent with that statute, a landlord may refuse to rent an apartment to a participant in a subsidy program for temporary housing because the landlord considers the termination provisions of a form lease provided by the subsidizing agency to be economically disadvantageous. Specifically, the plaintiff, Lori DiLiddo, a housing subsidy recipient, appealed from the entry of summary judgment in the Superior Court against her and in favor of the landlord's agent, Oxford Street Realty, Inc. (Oxford), and its principal, Jeffrey W. Indeck.[3] We transferred the appeal from the Appeals Court on our own motion.

---

[2]General Laws c. 151B, § 4 (10), provides: "It shall be an unlawful practice . . . [f]or any person furnishing credit, services or rental accommodations to discriminate against any individual who is a recipient of federal, state, or local public assistance, including medical assistance, or who is a tenant receiving federal, state, or local housing subsidies, including rental assistance or rental supplements, because the individual is such a recipient, or because of any requirement of such public assistance, rental assistance, or housing subsidy program."

[3]As described below, after proceedings in the Massachusetts Commission Against Discrimination (MCAD), Lori DiLiddo settled her claim against the landlord, who was never a party to this case. See note 11, *infra.* In the Superior Court, the Commonwealth was a party plaintiff, but did not appeal from the denial of its motion for summary judgment. See note 12, *infra.* The Commonwealth has nevertheless filed an amicus brief in this court in support of DiLiddo.

For the reasons discussed below, we conclude that the lease termination provision at issue was a "requirement," G. L. c. 151B, § 4 (10), of the alternative housing voucher program (AHVP), the program that provided a housing subsidy to DiLiddo. We further conclude that, where the Legislature has exercised its authority to set the balance between the protection of landlords' interests and the need for affordable housing, the defendants' refusal to agree to the provision violated the strictures of G. L. c. 151B, § 4 (10). We reverse the denial of the plaintiff's motion for partial summary judgment, vacate the order granting summary judgment to the defendants, and remand the case to the Superior Court for entry of judgment in favor of the plaintiff as to liability, and for further proceedings consistent with this opinion.[4]

1. *Background.* We first summarize the provisions of the AHVP, the subsidy program for temporary housing at issue in this case. The program was established following the abolition of rent control in the Commonwealth by popular initiative. See St. 1995, c. 179, § 16 ("An Act improving housing opportunities for elders and non-elderly persons with disabilities"). The statute called on the Executive Office of Communities and Development, now the Department of Housing and Community Development (department), to "establish and administer a *transitional* rental assistance program" for "eligible and qualified handicapped persons of low income," and to promulgate rules and regulations to implement the program (emphasis added). *Id.* The statute specifies that program participants pay a monthly rent on a rental unit limited to between twenty-five and thirty per cent of their income,[5] with the department paying the remainder of the costs of the unit. *Id.* Consistent with the transitional nature of the subsidy, the statute also provides that "all participants in the program shall be *required*, as a condition of their participation . . . to accept suitable permanent affordable housing in accordance with regulations established by [the department] once such housing becomes available" (emphasis added). *Id.*

---

[4]We also acknowledge the amicus briefs filed by the Massachusetts Commission Against Discrimination; AARP and Legal Assistance Corporation of Central Massachusetts, Inc.; and the Fair Housing Center of Greater Boston.

[5]The statute provides that participants are to pay a maximum of twenty-five per cent of their net income for a unit where the tenant pays utilities, or thirty per cent where the landlord pays utilities. St. 1995, c. 179, § 16, third par.

Pursuant to the enabling statute, the department created the AHVP, see 760 Code Mass. Regs. §§ 53.00 (1996), limiting eligibility to nonelderly, low income, handicapped persons. See 760 Code Mass. Regs. § 53.03. Among the requirements of program participation is that, "[w]hen a Participant chooses or is required to move, the Participant shall give a calendar month's written notice to the [local agency administering the program] and to the Owner or Owner's Agent." 760 Code Mass. Regs. § 53.07. The regulations also impose certain conditions on landlords, including that landlords provide "certification from the Local Board of Health or other local code enforcement entity that the unit is in compliance with Article II of the State Sanitary Code and (if applicable) a certification from a Certified Lead Inspector that the contract unit is in compliance with applicable lead paint law." Id.[6]

To administer the program, the department created a standard form lease to be signed by all landlords and tenants participating in the program (AHVP lease). Under the AHVP lease, tenancy is for a term of one year and is automatically extended from year to year unless either the landlord or the tenant gives sixty days' notice of election not to renew the lease. The AHVP lease does not allow either the landlord or the tenant to terminate the lease early, except for certain enumerated reasons that constitute "good cause." In those cases, a landlord may terminate the lease on thirty days' notice, and a tenant on one month's notice. Among the circumstances that constitute "good cause" under the AHVP lease are "when the Tenant becomes a participant in another housing subsidy program, or when the tenant secures Suitable Permanent Housing, as defined" in 760 Code Mass. Regs. § 53.02.[7,8] To further implement the transitional program, the department created an AHVP voucher, which every

---

[6]See 105 Code Mass. Regs. §§ 410.00 (2007) (minimum standards of fitness for human habitation [State Sanitary Code c. II]); 105 Code Mass. Regs. §§ 460.00 (2002) (lead poisoning prevention and control).

[7]Title 760 Code Mass. Regs. § 53.02 (1996) defines "Suitable Permanent Housing" as a "unit located by the Participant to which the Participant would transition from the Program."

[8]Terminating a lease will not necessarily end a tenancy. If a tenant becomes a participant in a housing subsidy program other than the alternative housing voucher program (AHVP), such as the so-called "Section 8" Federal housing subsidy program, 42 U.S.C. § 1437f (2006), and if the housing subsidy from

participant in the program must sign. The voucher requires participants to "[a]ttempt to locate other suitable housing for which [the] AHVP subsidy is not necessary." If a participant succeeds in securing suitable permanent affordable housing, the statute provides that her AHVP subsidy may be made available to the next eligible AHVP applicant. St. 1995, c. 179, § 16. The voucher and standard form lease each specify that the AHVP participant must give one calendar month's notice to both the landlord and the housing authority if suitable permanent housing is found.

The amount of funding made available by the Legislature for the AHVP program has varied from year to year. In 1996, for example, the AHVP program administered as many as 784 vouchers. In 2005, the AHVP served fewer than 236 households.

We turn now to the facts of this case. In the Superior Court, the plaintiffs and the defendants filed cross motions for summary judgment. Summary judgment entered in favor of the defendants from which DiLiddo appealed. Because the standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the respective nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002); *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), we summarize the facts in their light most favorable to DiLiddo. See *Yakubowicz* v. *Paramount Pictures Corp.*, 404 Mass. 624, 626 (1989) ("we look at the materials available to the judge for summary judgment purposes in the light most favorable to the [nonmoving party] to see whether, as a matter of law, they support a claim").

DiLiddo, who was disabled after an automobile accident in 1994, was issued an AHVP voucher by the Cambridge Housing Authority in April, 1998. In late May, 1998, DiLiddo viewed an apartment located at 2 Belvedere Place, in Cambridge. Marie Doubleday, a real estate agent (agent) working for Oxford, showed her the unit. DiLiddo was accompanied by Lisa Hart-

the second program can be applied to the same unit in which the tenant is living under the AHVP program, nothing in the lease or regulations prohibits the tenant from remaining in the unit.

nett, a housing advocate from CASCAP, Inc., a local nonprofit agency that worked to help AHVP voucher holders locate suitable apartments. The owner of the building at 2 Belvedere Place was Lillian Pepi. Oxford was the property manager of the building, responsible for locating, identifying, interviewing, and selecting tenants. After returning to Oxford's offices with Hartnett and the agent, DiLiddo expressed interest in renting the unit, and informed the agent that she held an AHVP voucher. The agent informed DiLiddo that she could rent the unit, and Oxford accepted a fee of $750 from DiLiddo for locating the apartment. Subsequently, Oxford mailed DiLiddo a "welcome to your apartment" letter.

At the time that Oxford offered DiLiddo the unit, Indeck testified, he and his company were aware that DiLiddo intended to use her AHVP voucher to pay the rent. Oxford nevertheless required that DiLiddo herself pay the rent for the first month, beginning June 1, because the first AHVP voucher payment was not expected until July 1. DiLiddo agreed to do so, and to be reimbursed by the landlord after the first voucher payment was processed.

On June 5, 1998, Hartnett sent Indeck a copy of the AHVP lease. Indeck was not familiar with the AHVP form lease, although he was familiar with the form lease required under the so-called "Section 8" Federal housing subsidy program. See 42 U.S.C. § 1437f (2006). After consulting with two attorneys and with Pepi's son, Indeck concluded that several of the AHVP form lease provisions were, he testified, "unreasonable and excessive." Specifically, Indeck objected to the provisions of the AHVP lease that would terminate the lease on one calendar month's notice "when the Tenant becomes a participant in another housing subsidy program, or when the Tenant secures Suitable Permanent Housing, as defined" in 760 Code Mass. Regs. § 53.02. Indeck testified at his deposition that he believed that these provisions placed an "unreasonable" burden on landlords. Indeck also objected to a provision allowing the local housing authority and the department access to the landlord's premises and records for audit purposes, which he found "invasive"; to a provision that would vary the tenant's share of the rent if the tenant's income changed; and to a provision requesting the owner's Social Security number.

Indeck testified that he attempted to persuade CASCAP and the local housing authority to modify the lease provisions to which he objected. Unsuccessful in these negotiations, Indeck informed DiLiddo by telephone that he could not sign the AHVP lease "because of provisions in it that were unreasonable," although he would be "happy to sign a regular lease agreement with her [and] . . . have her as a tenant." See note 13, *infra*. Unable to use her AHVP voucher to rent the apartment, Di-Liddo once again commenced a search for suitable housing, which she subsequently secured, but only after incurring certain costs.

In December, 1998, DiLiddo filed a complaint with the human rights commission of Cambridge and the Massachusetts Commission Against Discrimination (MCAD), alleging that Oxford and the landlord had discriminated against her in violation of G. L. c. 151B, § 4 (10).[9],[10] In October, 2003, MCAD found probable cause against Oxford,[11] which timely exercised its right under G. L. c. 151B, § 5, to have the claims against it resolved in the Superior Court by filing notice with the commission. In November, 2003, the Commonwealth commenced this action against Oxford, also naming Indeck as a defendant.[12] DiLiddo exercised her statutory right under G. L. c. 151B, § 5, to intervene as a plaintiff. In July, 2006, following a hearing on all parties' cross motions for summary judgment or partial summary judgment, a Superior Court judge allowed the defendants' joint motion for summary judgment and denied the

[9]Pepi, whom Indeck testified was seventy-eight years old, was sufficiently distant from the day-to-day management of the building, which she had delegated to Oxford, that she had no knowledge of either DiLiddo or any of the events at issue in this case until she received the complaint filed by Di-Liddo with the human rights commission of Cambridge in December, 1998.

[10]DiLiddo also alleged a violation of G. L. c. 151B, § 4 (7A) (discrimination on basis of handicap). The commission found no probable cause to support this allegation, and it forms no part of this case.

[11]By then, DiLiddo had resolved her claim against Pepi at a MCAD conciliation conference on October 1, 2003.

[12]General Laws c. 151B, § 5, provides that, when either a claimant or a respondent elects judicial determination, the MCAD "shall authorize . . . and . . . the attorney general shall commence and maintain, a civil action on behalf of the complainant in the superior court for the county in which the unlawful practice occurred. Any complainant may intervene as of right in said civil action."

plaintiffs' motions. The judge concluded that the provisions of the AHVP lease disputed by Oxford were not "requirements" of the AHVP program. In the alternative, she ruled, if the provisions were "requirements" of that program, the defendants had not violated G. L. c. 151B, § 4 (10), because their objections to the "requirements" constituted "legitimate, non-discriminatory reasons" for refusing to rent to DiLiddo, and because they acted on the advice of counsel. DiLiddo appealed.

2. *The "requirement" provision of G. L. c. 151B, § 4 (10).* The defendants make no challenge, constitutional or otherwise, to the validity of the statute prohibiting landlords from discriminating on the basis of "any requirement" of housing subsidy programs, G. L. c. 151B, § 4 (10). Nor do they challenge the validity of the statute creating the housing subsidy program at issue in this case, St. 1995, c. 179, § 16. They do not challenge that the AHVP is a valid temporary housing subsidy program created in furtherance of the statute, and they do not challenge the regulations implementing the AHVP, 760 Code Mass. Regs. §§ 53.00. The question presented therefore is a narrow one of statutory interpretation: Is the one-month termination provision of the AHVP lease a "requirement" of the AHVP, and, if so, is it a requirement that a landlord may reject for purported financial reasons without running afoul of the housing antidiscrimination law?[13]

We begin with basic principles of statutory interpretation. We interpret a statute "according to the intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be advanced." *Glasser* v. *Director of the Div. of Employment Sec.,* 393 Mass. 574, 577 (1984). "The statutory language, when clear and unambiguous, must be given its ordinary meaning." *Bronstein* v. *Prudential Ins. Co.,* 390 Mass. 701, 704 (1984). The relevant section of G. L. c. 151B makes it unlawful for a landlord to discriminate against recipients of rental assistance or housing subsidies "because of any

---

[13]It appears that Indeck's primary objection to the form lease was to the one-month termination provision. The judge in the Superior Court implied that this was his *only* objection to the lease. The record reveals a longer series of objections, mentioned above. At his deposition, Indeck suggests that, if the termination provision of the AHVP lease had been compromised, he would have signed the lease, but his testimony is ambiguous on that point.

requirement" of the "housing subsidy program." G. L. c. 151B, § 4 (10). The language is unambiguous. By its plain terms, a "requirement" is "[s]omething that is required; a necessity." American Heritage Dictionary of the English Language 1533 (3d ed. 1992). The defendants do not contest that the department developed the standard form lease in order to implement the AHVP, nor do they claim that the department's decision to require landlords and tenants to sign the AHVP lease was "arbitrary, capricious, or contrary to law." *Atlanticare Med. Ctr. v. Commissioner of the Div. of Med. Assistance*, 439 Mass. 1, 5 (2003), quoting *Tarin v. Commissioner of the Div. of Med. Assistance*, 424 Mass. 743, 750 (1997) (judicial review of administrative action "limited to a determination whether the State action is arbitrary, capricious, or contrary to law"). Rather, the defendants suggest that the department lacked the authority to require that a landlord use the AHVP lease because neither the statute nor the regulations mandate any particular form of lease. General Laws c. 151B, § 4 (10), does not limit the scope of the term "requirement" to a statutory provision or regulation, and their argument misconstrues the legitimate reach of the department's authority.

The Legislature granted the department broad authority to "establish and administer" a transitional housing subsidy program. St. 1995, c. 179, § 16. The development of a standard form AHVP lease containing clauses designed to implement the program's transitional character is well within the bounds of the department's mandate from the Legislature. Cf. *Liberty Mut. Ins. Co. v. Commissioner of Ins.*, 395 Mass. 765, 771 (1985) (upholding agency's authority to require standard coverage terms and standard form in automobile insurance context). We find no support for, and accordingly reject, the view of the defendants and of the judge that the "requirements" provision of G. L. c. 151B, § 4 (10), pertains exclusively to an obligation to provide "decent" housing.[14] The statute, fairly read, will not admit such an interpretation, as evidenced compellingly by the

---

[14]No reference to "decent" housing is found in the statute, or the regulations governing the AHVP. That term is used in Section 8 of the United States Housing Act of 1937, the Federal statute creating the so-called "Section 8" housing voucher program. See 42 U.S.C. § 1437f (a) (2006). That program is not at issue here.

statutory history of G. L. c. 151B, § 4 (10), as we now explain.

The General Court added § 4 (10) to G. L. c. 151B in 1971. St. 1971, c. 726. As originally enacted, the provision prohibited landlords from discriminating against any recipient of public assistance or housing subsidies, such as rental assistance or rental supplements, "solely because the individual is such a recipient."[15] In *Attorney Gen.* v. *Brown,* 400 Mass. 826 (1987) (*Brown*), this court considered whether a landlord had violated G. L. c. 151B, § 4 (10), when he refused to rent to tenants holding Section 8 housing subsidy vouchers on the ground that he objected to certain terms in the standard form lease used by the department for all tenancies subsidized by the Section 8 program. In particular, the landlord, whose own form lease required tenants to pay their last month's rent, and in some cases an additional month's rent as a security deposit, in advance of occupancy, objected to the Section 8 form lease that contained no such provisions. *Id.* at 832-833. This court concluded that, although the landlord's reasons for refusing to accept Section 8 voucher participants as tenants were "related to the requirements of the Section 8 program," the evidence did not establish that the landlord discriminated "solely" on the basis of an individual's status as a Section 8 voucher recipient. *Id.* at 834. Thus, the *Brown* court distinguished between housing discrimination "solely" because a prospective tenant holds a housing subsidy voucher, and discrimination that occurs because a landlord refuses — in that case for economic reasons — to be subject to the "requirements" of the housing subsidy program. The 1971 statutory language, this court concluded, prohibited only the former. *Id.* at 834. See St. 1971, c. 726 (making it unlawful to discriminate "solely" because the individual is subsidy recipient). See note 15, *supra.*

Two years after the *Brown* decision, the General Court sought to amend G. L. c. 151B, § 4, to make more housing available

---

[15]Before it was amended in 1990, as described below, G. L. c. 151B, § 4 (10), provided in full that it shall be an unlawful practice "[f]or any person furnishing credit, services or renting accommodations to discriminate against any individual who is a recipient of federal, state or local public assistance, including medical assistance, or who is a tenant receiving federal, state or local housing subsidies, including rental assistance or rent supplements, *solely because the individual is such a recipient*" (emphasis added).

to persons with disabilities and to strengthen certain provisions of c. 151B. See St. 1989, c. 722. The original legislation imposed certain new burdens on landlords,[16] but did not seek to amend G. L. c. 151B, § 4 (10). See, e.g., 1989 Senate Doc. No. 1735; 1989 House Doc. No. 5534. An amendment was subsequently introduced adding to the bill a provision to amend G. L. c. 151B, § 4 (10). See 1989 House J. 1669-1670. This amendment, passed by the House on December 28, 1989, removed the word "solely" from G. L. c. 151B, § 4 (10), and added new language making it unlawful for a landlord to discriminate against a housing subsidy recipient *either* "because the individual is such a recipient," *or* "because of any requirement of such public assistance, rental assistance, or housing subsidy program." St. 1989, c. 722, § 19A. See 1989 House J. 1822. The amended bill was enacted by both chambers on January 2, 1990, and signed into law by the Governor on January 13, 1990. 1989 House J. 2250. The 1990 amendment to G. L. c. 151B, § 4 (10), thus clarified that both kinds of housing discrimination that this court had parsed so carefully in *Brown* were now unlawful under G. L. c. 151B, § 4 (10). Indeed, the language of the 1990 amendment ("because of any requirement of . . . [the] housing subsidy program") mirrors the language used in *Brown, supra* at 834 ("related to the requirements of the Section 8 program").[17]

The facts of this case parallel the facts in the *Brown* case, but the General Court's amendment to G. L. c. 151B, § 4 (10), compels a different result. As in *Brown*, the administrative agency charged with implementing the relevant housing subsidy

---

[16]For example, one provision of the proposed statute required landlords to modify existing units to accommodate tenants with disabilities. For larger buildings, the owner rather than the tenant would be required to bear all of the costs of modification or alteration of the building. As finally enacted, the bill provided for an exemption for landlords in the case of "undue hardship." 1989 Senate Doc. No. 1735, § 17. See St. 1989, c. 722, § 18.

[17]The MCAD, the agency charged with enforcing G. L. c. 151B, and whose reading of the statute is entitled to deference, see *Bynes* v. *School Comm. of Boston*, 411 Mass. 264, 269 (1991); *Rock* v. *Massachusetts Comm'n Against Discrimination*, 384 Mass. 198, 204 (1981), has concluded that the 1990 amendment to G. L. c. 151B, § 4 (10), "track[s] the very language of the *Brown* decision with an obvious intent to reverse the effect of that decision." Hogan *vs.* Gaipo, MCAD No. 98-BPR-2756 (March 13, 2002) (order of the full commission).

program requires a standard form lease from all participants in the AHVP program. As in *Brown*, a landlord has objected to certain provisions of the form lease that she deems economically disadvantageous, has refused to sign the lease, and has refused to accept the tenant for that reason. Where the statutory language in effect when this court decided the *Brown* case permitted the landlord to defend against a claim of discrimination on that basis, *id.* at 835, Oxford's similar repudiation of the requirements contained in the AHVP lease falls squarely within the ambit of the prohibition of the statute as amended.

The defendants argue that, even if the termination provisions of the AHVP lease are "requirements" of the AHVP for purposes of our antidiscrimination law, they may refuse to accept those requirements so long as they had a "legitimate, non-discriminatory reason" for doing do. Put another way, they contend that, because they rejected the AHVP based on a good faith attempt to serve the landlord's economic interests and not from any discriminatory "animus," they may not be held liable for housing discrimination under G. L. c. 151B, § 4 (10). But it is G. L. c. 151B, itself, not the defendants' conception of what should or should not constitute discrimination, that delineates what is "legitimate" and "nondiscriminatory" under the statute. The statute contains no language requiring a showing of "animus."

The defendants urge that we read into the statute an exception that would allow landlords to reject a participant in any housing subsidy program whose requirements could cause the landlord "substantial economic harm." We may not rewrite the statute's clear terms.[18] See, e.g., *State Bd. of Retirement* v. *Boston Retirement Bd.*, 391 Mass. 92, 94 (1984) ("we need not look beyond the words of the statute where the language is plain and unambiguous"). The General Court was aware that St. 1989, c. 722, imposed financial burdens on landlords, and it made various policy judgments striking the balance between those burdens and the public interest in making housing accessible and affordable for disabled persons. For example, the statute requires that the owner of a rental housing property containing ten or more units, rather than a tenant, bear the cost

---

[18]We do not consider whether the requirements of the AHVP standard form lease in fact cause substantial economic harm to a landlord.

of modifying an existing unit to accommodate a tenant with disabilities, but provides an exception to that requirement "if it would impose undue hardship" on the landlord. St. 1989, c. 722, § 18. G. L. c. 151B, § 4 (7A). The statute then enumerates a series of factors to be considered in resolving that issue. *Id.* No such exception is applicable to the provision at issue here. See St. 1989, c. 722, § 19A; G. L. c. 151B, § 4 (10). Absent a challenge to the reach of the statute itself, or a challenge to the scope of the implementing regulations, we may not strike a different balance.

The defendants also contend that they should not be held liable for violating G. L. c. 151B, § 4 (10), because they acted as mere agents, following the instructions of the building's owner, Pepi. Specifically, Indeck and Oxford argue that they had "no choice" in the decision, merely acting as a "messenger." We need not decide whether a broker or agent who in fact acts solely as a "messenger" for the decisions of a landlord, exercising no independent judgment, can be held liable under G. L. c. 151B, § 4 (10), because here the judge found, and the record amply supports, that Oxford and Indeck were responsible for "locating, interviewing and choosing" tenants for Pepi. While Indeck testified at his deposition that "I am not the one that makes the final decision," the defendants do not dispute that they play a role in the process of locating, interviewing, and choosing tenants. General Laws c. 151B, § 4 (10), applies to "any person furnishing credit, services or rental accommodations." In addition, G. L. c. 151B, § 4 (5), provides that it is unlawful "[f]or any person, whether an employer or an employee or not, to aid, [or] abet . . . the doing of any of the acts forbidden under this chapter or to attempt to do so." Thus, the test is whether Oxford and Indeck, at a minimum, "aid[ed]" or "abet[ted]" a violation of G. L. c. 151B, § 4 (10). Oxford and Indeck's attempt to distance themselves from Pepi's decision is ill placed.[19]

The defendants argue that they had a fiduciary duty to Pepi

---

[19]As noted above, Pepi delegated to Oxford a sufficient degree of day-to-day responsibility for managing the property that Pepi was not aware of any of the events involved in this case until months after the fact. See note 9, *supra.* Indeck testified that he consulted with Pepi's son about the lease provisions at issue in this case. But nothing in the record suggests that Pepi's son had the authority to require Indeck to refuse to sign the AHVP lease. Nor does

to follow her instructions to find a tenant willing to agree to a one-year lease, and that it would have been a breach of duty to sign the AHVP lease.[20] But both Oxford and Pepi were legally obligated not to discriminate on the basis of a "requirement" of a housing subsidy. The fiduciary duty Oxford owed to Pepi surely required Oxford to comply with the law; by refusing to sign the AHVP lease, Oxford exposed both itself and Pepi to potential liability. See *Ruffino* v. *State St. Bank & Trust Co.*, 908 F. Supp. 1019, 1048 (D. Mass. 1995) (noting that "any person" language of G. L. c. 151B, § 4, unambiguously exposes both agents and principals to liability).

The AHVP housing subsidy program affects relatively few individuals. But if landlords or their agents are permitted to reject for their own reasons the "requirements" of the AHVP program, that could have, as the Commonwealth argues, "a potentially widespread and profound impact on the ability of residents in the Commonwealth to utilize any rental assistance voucher to locate and then actually obtain affordable housing." The General Court has spoken unambiguously. See G. L. c. 151B, § 4 (10). The defendants have proffered no basis for us to ignore its mandate.

3. *Advice of counsel.* The defendants argue, and the judge concluded, that the defendants should be absolved of all liability because they acted on the advice of counsel. The defense of reliance on advice of counsel is available, but only in limited contexts. For example, it is established as a defense to the charge of malicious prosecution. See, e.g., *Higgins* v. *Pratt*, 316 Mass. 700, 713 (1944). The defense may serve to rebut the scienter element of a crime or civil charge requiring a wilful or

the record show that Pepi's son was authorized to act on Pepi's behalf. Indeck did testify that Pepi's "son was acting on her behalf," noting that the son "was the executor of her estate." This is insufficient to establish legal authority to act on behalf of Pepi while she is alive.

[20]Oxford and Indeck argue that "DiLiddo refused to sign a year-long lease," contending that the AHVP lease is "month-to-month." This is incorrect. By its terms, the AHVP form lease requires a term of one year; an AHVP housing subsidy voucher cannot be used to secure a month-to-month tenancy. The defendants refer to "DiLiddo's desire for flexibility so as to be able to leave one apartment for another," but the AHVP form lease does not permit tenants to end their tenancy at will. The termination provision allows voucher holders to terminate a year-long lease only when they are required to do so by statute. See St. 1995, c. 179, § 16.

intentional violation of the law. See, e.g., *G.S. Enters., Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 269 (1991) (considering advice of counsel defense against charge of intentional interference with contractual relations); *United States* v. *Powell*, 513 F.2d 1249, 1251 (8th Cir. 1975) (jury instruction on advice of counsel "warranted only where the crime charged involves willful and unlawful intent"). General Laws c. 151B, § 4 (10), in contrast, does not require that a landlord wilfully or intentionally violate the law. Advice of counsel is not a defense to a claim under that statutory provision.

4. *Conclusion.* We reverse the denial of the plaintiff's motion for partial summary judgment, vacate the order granting summary judgment to the defendants, and remand the case to the Superior Court for entry of judgment in favor of the plaintiff as to liability, and for further proceedings consistent with this opinion.

*So ordered.*