JOHN F. WELCH, JR.[1] *vs.* DANIEL J. BARACH & others.[2]

No. 12-P-1308.

Suffolk. March 7, 2013. - August 8, 2013.

Present: BERRY, SIKORA, & MILKEY, JJ.

*Uniform Securities Act. Consumer Protection Act,* Unfair or deceptive act. *Words,* "Material fact."

Discussion of the standard of liability under the Uniform Securities Act, G. L. c. 110A, §§ 101-417, for the omission of material fact by the seller of securities. [119-121]

In a civil action seeking private relief under the Uniform Securities Act, G. L. c. 110A, §§ 101-417, the judge properly granted summary judgment in favor of the defendant hedge fund operator, where the omission by the defendant, from a private placement memorandum describing the fund and his qualifications as its manager, of his involvement in litigation several years before the plaintiff's investment in the fund did not constitute the omission of a material fact, in that the connection of the litigation to the plaintiff's investment decision was weak and the positive factors support- ing the decision to invest were strong [121-122]; similarly, the omission did not constitute an unfair or deceptive act within the meaning of G. L. c. 93A, § 9 [122-123].

CIVIL ACTION commenced in the Superior Court Department on May 1, 2009.

The case was heard by *Christine M. Roach,* J., on motions for summary judgment.

*Jeffrey S. Robbins* for the plaintiff.

*Kevin J. O'Connor* for the defendants.

SIKORA, J. This appeal arises from a Superior Court action for private civil relief authorized by the Uniform Securities Act codified in Massachusetts as G. L. c. 110A, §§ 101-417 (securi- ties act). In relevant part, the securities act enables the purchaser of a security to sue its offeror or seller for restitutional dam-

---

[1] Individually and as trustee of the John F. Welch, Jr. 2004 Revocable Trust.

[2] MLT Capital, L.P.; MLT Management, LLC; and MLT Advisors Corp.

ages, reasonable attorney's fees, and costs, if that offeror or seller has omitted a "material fact" from the information communicated to the purchaser in the explanation or inducement of the purchase. G. L. c. 110A, § 410(*a*)(2).[3]

The plaintiff, John F. Welch, Jr., appeals from summary judgment entered against his claims of liability for omission of a material fact and for relief under (1) the securities act and (2) the consumer protection act, G. L. c. 93A, § 9.[4]

Welch contends that defendant Daniel J. Barach, a hedge fund operator, omitted a material fact from a memorandum describing the fund and his qualifications as its manager: Barach's involvement in litigation several years before Welch's investment in the fund. Welch maintains that the omission affected his decision in 2003 to invest. During the period of early 2007 through 2008, the fund declined and then liquidated. Welch lost most of his investment of $7 million. For the following reasons, we affirm the judgment.

*Background.* The following facts emerge from the summary judgment record as undisputed.

---

[3]Section 410 provides:

"(*a*) Any person who . . . (2) offers or sells a security by means of . . . any omission to state a *material fact* necessary in order to make the statements made, in the light of the circumstances . . . not misleading, the buyer not knowing of the . . . omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the . . . omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with [simple interest at the rate of six percent] from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, . . . or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent per year from the date of disposition." (Emphasis supplied.)

G. L. c. 110, § 410(*a*)(2), inserted by St. 1972, c. 694, § 1.

[4]General Laws c. 93A, § 1(*b*), as amended by St. 1987, c. 664, § 1, defines "trade" and "commerce" to include transactions in "any security as defined in subparagraph (*k*) of [G. L. c. 110A, § 401]." Section 2(*a*) makes unlawful unfair or deceptive acts or practices in the conduct of any trade or commerce; § 9(3) and (4) prescribe a process for claims by consumers and a right to recovery of multiple damages and reasonable attorney's fees.

1. *Parties.* In 1997, Barach organized the hedge fund under the name of MLT Capital, L.P. (MLT Capital).[5] He created MLT Management, LLC, as the sole general partner of MLT Capital, and MLT Advisors Corp. as its investment advisor. It is undisputed that Barach alone (1) controlled, managed, and directed all of MLT Capital's activities; (2) made all investment decisions; and (3) solicited investors. He pooled investments for the purpose of trading in domestic and foreign securities. Barach built the fund upon a specific strategy. He searched for companies engaging in management-led turnarounds; he researched their financial positions and arranged meetings with the incoming chief executive officer. From his assessment of a company's turnaround plan, financial condition, and its new management team, he decided whether to make an early investment in the rehabilitating company. From 1997 into 2003, the fund achieved consistent success.

In early June of 2003, Barach, a 1988 graduate of Harvard Business School, traveled to Boston to attend a class reunion. A classmate and friend, Suzy Wetlaufer, introduced Barach to Welch. Welch was an experienced business manager and executive. In 2001, Welch had retired as chairman and chief executive officer of the General Electric Company. Wetlaufer had praised Barach's acumen and identified him to Welch as an exceptional achiever at the business school.[6] From their introduction in early June

---

[5] A hedge fund is a "private investment partnership . . . in which the general partner has made a substantial personal investment, and whose offering memorandum allows for the fund to take both long and short positions, use leverage and derivatives, and invest in many markets." Downes & Goodman, Dictionary of Finance and Investment Terms 307 (7th ed. 2006). Hedge funds "require substantial minimum investments that . . . typically range from about $250,000 to $10 million." *Ibid.*

See Black's Law Dictionary 791 (9th ed. 2009). A hedge fund is a "specialized investment group — usu[ally] organized as a limited partnership or offshore investment company — that offers the possibility of high returns through risky techniques such as selling short or buying derivatives. Most hedge funds are not registered with the [Securities and Exchange Commission] and are therefore restricted in marketing their services to the public." *Ibid.*

[6] Wetlaufer informed Welch that Barach had been a Baker Scholar, an honorary designation awarded by Harvard Business School to members ranking in the top five percent of the class. Wetlaufer too had been a Baker Scholar.

At some time after the June, 2003, introduction, Welch and Wetlaufer married.

Welch *v.* Barach.

of 2003, Welch became impressed with, and interested in, the operation of the hedge fund, and requested additional information about it.

2. *Private placement memorandum.* From the outset, Barach had issued to potential investors a forty-nine page private placement memorandum dated November 24, 1997 (1997 PPM), and describing the operation and management of the fund. A specific assurance in the 1997 PPM declared that "[t]here have been no administrative, civil or criminal actions, whether pending, on appeal, or concluded, against the General Partner or Barach."[7] When Barach created the PPM in 1997, that statement was accurate.[8]

3. *Prior lawsuit against Barach.* In 1999, Barach's residential landlords, Samuel and Eva Yasgur, sued in New York Supreme Court to evict Barach and his family from their leased house in Westchester County. The lawsuit arose from a dispute over the term of the Barachs' lease. According to the litigation papers, the Barachs had requested that the Yasgurs permit them to extend their tenancy for a few weeks because they had recently closed on a home and wanted to avoid moving their young children twice during a short period of time. The Yasgurs refused, but the Barachs remained in the house. The day before the expiration of the tenancy, Eva Yasgur went to the house with her two adult children in an attempt to regain possession of the premises. She alleged that Barach had not only refused to vacate, but that he had made a series of threats to damage the property.

---

[7]The 1997 PPM described the "General Partner" as the "sole general partner" of MLT Capital. It also stated that "Barach is the sole manager and principal member of the General Partner." Although Barach's wife was the "other member of the General Partner[,] . . . she [was] not involved in any way in [MLT Capital's] operations or activities." The 1997 PPM made clear that Barach was the sole operator of MLT Capital.

[8]The 1997 PPM included also the following language:

> "THE INFORMATION CONTAINED HEREIN IS GIVEN AS OF THE DATE HEREOF AND THIS MEMORANDUM DOES NOT PURPORT TO GIVE INFORMATION AS OF ANY OTHER DATE. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF." (Capitalization in original.)

As a result of this alleged confrontation, the Yasgurs, on June 21, 1999, sued to evict the Barachs. They achieved, ex parte, a temporary restraining order forbidding any harm by Barach to the Yasgurs' property. Shortly after its commencement, the parties settled the lawsuit. The terms permitted the Barachs to stay at the premises for the requested three additional weeks and to pay a reduced rate of rent. After the incident Barach did not alter the litigation provision in the 1997 PPM; it remained intact at the time of his encounter with Welch in 2003.

4. *Welch's investments.* As a result of their first meeting in Boston, Barach and Welch met on June 27, 2003, in New York City. Welch signed the appropriate documents for participation in MLT Capital. The amount of Welch's initial investment was $2 million. In 2004, Welch invested an additional $5 million. In deposition testimony, Welch specified the several considerations motivating his investment decision: (1) Barach's strategy of identifying turnaround companies under new management whom he had directly assessed; (2) MLT Capital's successful record of performance from 1997 onward; (3) its moderate fees; (4) Barach's personal qualities, including his business school achievement; and (5) Wetlaufer's esteem. Welch distinguished between investing with "leading investment firms" and investing with "single investors." Welch placed Barach in the latter category; he stated that the "character of that [single investor] was critical to my investment decision."

In December, 2005, Barach had revised the 1997 PPM and distributed the new version to investors, including Welch. The updated PPM (2005 PPM) (1) changed the name of the law firm representing MLT Capital; (2) increased the minimum investment amount from $250,000 to $2 million; and (3) imposed a two-year "Lock-up" period for withdrawals of capital contributions made after January, 2006. Barach did not change the disclaimer of prior litigation.

5. *Decline and dissolution of MLT Capital.* In 2007, MLT Capital began to founder. In the autumn of 2007, Welch proposed to withdraw his stake. However, Barach convinced him to maintain his investment; Barach expressed optimism for the performance of MLT Capital in 2008. In October, 2008, Welch again requested the complete withdrawal of his investment, to

take effect on December 31, 2008. However, by December, 2008, in the throes of the economic downturn, MLT Capital had suffered severe additional losses. Barach wrote to his investors on December 12, 2008, that he was shutting down the fund.

Welch lost all but a small fraction of his $7 million investment. He subsequently learned of the 1999 New York litigation. In deposition, Welch testified, "If I had known that [Barach] had made threats to people and their property, I would have run so far from a character like this, and I would not put a dollar in there."

6. *Procedural history.* Welch brought suit in Superior Court on May 1, 2009, upon claims that the absence from the 1997 PPM and the 2005 PPM of any reference to Barach's litigation constituted a material omission within the meaning of G. L. c. 110A, § 410(*a*)(2), and an unfair or deceptive act or practice within the meaning of the consumer protection act, G. L. c. 93A, § 9. Barach moved to dismiss the complaint for failure to state a claim entitled to relief. Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974). A judge denied the motion upon the ground that "Barach was the sole person upon whom MLT's investment decisions rested, and that information concerning Barach's character and judgment was therefore material."

At the conclusion of extensive discovery, the parties submitted cross motions for summary judgment.[9] By means of a detailed memorandum and order, a different judge (motion judge) concluded that the omission of the reference to the New York litigation lacked the materiality necessary for a securities act violation and for the commission of conduct unfair or deceptive within the meaning of the consumer protection act. She reasoned that "no reasonable investor in Welch's position would have viewed the brief housing dispute against Barach . . . as material to the decision whether to purchase interests in MLT Capital," and held the omission immaterial as a matter of law.

*Analysis.* 1. *Standard of review.* We work de novo from the same record as did the motion judge. *Miller* v. *Cotter*, 448 Mass. 671, 676 (2007). The inquiry is whether the evidence in

[9]Barach sought complete summary judgment on both the securities act and the consumer protection act claims; Welch moved for partial summary judgment on the securities act claim.

the light most favorable to the nonmoving party establishes all material facts and entitles the moving party to judgment as a matter of law. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). In review of a decision of cross motions for summary judgment, a judge inspects the record in the light most favorable to the losing party. See *DiLiddo* v. *Oxford St. Realty, Inc.*, 450 Mass. 66, 70 (2007); *McLaughlin* v. *Berkshire Life Ins. Co. of America*, 82 Mass. App. Ct. 351, 352, 354 (2012).

2. *Standard of liability under the securities act.* Like its counterpart, the Federal Securities Act of 1933, 15 U.S.C. §§ 77a et seq. (2006) (Federal securities act), the Massachusetts securities act creates criminal and civil liability for securities-related infractions. See *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 50 (2004) (citing G. L. c. 110A, §§ 409, 410, and 15 U.S.C. §§ 77k, 77l, 77y). Section 410(*a*)(2) furnishes the Massachusetts securities act's sole private civil remedy for misrepresentations and omissions, and corresponds to § 12(a)(2) of the Federal securities act, 15 U.S.C. § 77l(a)(2). See *Marram* v. *Kobrick Offshore Fund, Ltd.*, *supra* at 50-51. Section 415 of the Massachusetts securities act directs Massachusetts courts "to coordinate the interpretation and administration of this chapter with the related federal regulation" of securities trading. G. L. c. 110A, § 415, inserted by St. 1972, c. 694, § 1. Accordingly we consult Federal case law under the Federal securities act and siphon persuasive reasoning into our interpretation of the Massachusetts securities act. See *Marram* v. *Kobrick Offshore Fund, Ltd.*, *supra* at 50-55.[10]

An important purpose of § 410(*a*)(2) is the creation of a "strong incentive for sellers of securities to disclose fully all material facts about the security" and of a "heightened deterrent" against misrepresentation and omission. *Marram* v. *Kobrick Offshore Fund, Ltd.*, *supra* at 51, quoting in part from *Casella* v. *Webb*, 883 F.2d 805, 809 (9th Cir. 1989). To serve

---

[10]The Legislature's specific direction reinforces the usual canon that our courts will respect Federal court interpretations of similar terms in parallel acts of Congress. See, e.g., *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 611 (1980); *Commonwealth* v. *One 1986 Volkswagen GTI Auto.*, 417 Mass. 369, 373 (1994); *Commonwealth* v. *Colon*, 81 Mass. App. Ct. 8, 14 (2011).

those statutory purposes, the case law has dispensed with certain requirements of common-law tortious misrepresentation.[11] Statutory liability under G. L. c. 410(a)(2) does not require proof (1) that a misstatement or omission amounted to actual causation of a reasonable investor's detrimental decision, *Marram* v. *Kobrick Offshore Fund, Ltd.*, *supra* at 52-53, 57 n.24, or (2) that the investor specifically relied upon the misstatement or omission, *id.* at 53-54, 55; nor (3) does it consider the sophistication of the investor as an element of defense. *Id.* at 53, 55, and Federal cases cited.

Rather the statutory standard of a "material" misstatement or omission is the "substantial likelihood" that the omitted information would have "significantly altered the 'total mix' of information" available to the ordinary reasonable investor. *Id.* at 57-58, quoting from *Craftmatic Sec. Litigation* v. *Kraftsow*, 890 F.2d 628, 641 (3d Cir. 1989). Amid the "total mix" of information, the misstated or omitted fact must have been important to the hypothetical reasonable investor, see *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. at 58; but it need not have been causally or decisively important to his investment decision. *Id.* at 57-58 n.24, citing *Jackson* v. *Oppenheim*, 533 F.2d 826, 830

---

[11]In Massachusetts, the prima facie elements of intentional misrepresentation (or "deceit") are (a) an intentional or reckless (b) misstatement (c) of an existing fact (d) of a material nature, (e) causing intended reasonable reliance and (f) financial harm to the plaintiff. See *Masingill* v. *EMC Corp.*, 449 Mass. 532, 540 (2007), and cases cited. See also Nolan & Sartorio, Tort Law § 8.1 (3d ed. 2005).

The elements of negligent misrepresentation are (a) a provision, in the course of the defendant's business, profession, or employment, or in the course of a transaction of his pecuniary interest, (b) of false information for the guidance of others in their business transactions, (c) without the exercise of reasonable care or competence in the acquisition or communication of the information, (d) causing justifiable reliance by, and (e) resulting in pecuniary loss to, the plaintiff. *Cumis Ins. Society, Inc.* v. *BJ's Wholesale Club, Inc.*, 455 Mass. 458, 471-472 (2009). *Golber* v. *BayBank Valley Trust Co.*, 46 Mass. App. Ct. 256, 257 (1999), and cases cited.

A "material" fact is one to which a reasonable person would attribute importance for his or her choice of action in the transaction at issue. *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 78 (1991). See *Ravosa* v. *Zais*, 40 Mass. App. Ct. 47, 52 (1996); Restatement (Second) of Torts § 538(2)(a) (1977). It must be one of the principal grounds, but not necessarily the sole ground, causing the plaintiff's decision. *National Car Rental Sys., Inc.* v. *Mills Transfer Co.* 7 Mass. App. Ct. 850, 852 (1979).

n.8 (2d Cir. 1976); *Metromedia Co.* v. *Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992), cert. denied, 508 U.S. 952 (1993).

3. *Application to the summary judgment record.* For multiple reasons the summary judgment record does not permit, as a genuine issue of material fact, a substantial likelihood that the undisclosed information of Barach's litigation would have altered significantly the mix of information considered by a reasonable investor. The thrust of Welch's argument is that MLT Capital was a one-man enterprise and that therefore the integrity of that one man became a paramount criterion for an investment decision. We do not underestimate the importance of character in the circumstance of such a solo venture. However, two sets of evidence drain the undisclosed litigation of significance within the total mix of information: the weakness of the connection of Barach's litigation to the investment decision; and the contrasting strength of the positive factors supporting the decision to invest.

The landlord-tenant dispute was a solitary episode. It consisted of allegations, not an adjudication. It was brief. It resulted in a voluntary resolution seemingly favorable to Barach. It was remote in time from the investment decision (by the four years between 1999 and 2003). It was equally remote in substance as a personal or family matter, rather than a controversy about business competence or integrity.[12] During the four-year interim since the dispute, MLT Capital had accrued an impressive record. If either PPM had identified the dispute, Barach would have included his response to the allegations.

Meanwhile Welch acknowledged the cogent positive factors favoring investment: the strategy or concept of concentration upon well researched and personally inspected turnaround companies; the successful hedge fund performance extending from inception in 1997 to investment in 2003; MLT Capital's attrac-

---

[12]See *GAF Corp.* v. *Heyman*, 724 F.2d 727, 740 (2d Cir. 1983) (undisclosed lawsuits involving family members are "less likely to be matters of importance to public shareholders"). The motion judge recognized that certain personal matters of an officer lay beyond the outer limits of a reasonable investor's concern. The judge, quoting from *Greenhouse* v. *MCG Capital Corp.*, 392 F.3d 650, 660 (4th Cir. 2004), observed that the concept of materiality does not permit "almost *any* misrepresentation by a CEO — including . . . marital infidelity, political persuasion, or golf handicap . . . [to] serve as basis for . . . securities fraud" (emphasis original).

tive fee structure; Barach's personal acumen and academic achievement; and Wetlaufer's endorsement. In the eyes of a reasonably prudent investor, the unreferenced litigation would constitute an insignificant ingredient of the resulting mix. The omission was "so obviously [un]important to an investor[] that reasonable minds [could not] differ on the question of materiality" and the judge could "rule that the allegations [were] inactionable [']as a matter of law.[']" *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. at 58, quoting from *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 450 (1976). Summary judgment was the appropriate disposition of the securities act claim.

4. *Liability under the consumer protection act.* The motion judge, in support of full summary judgment, determined also that the omission did not constitute an act or practice "unfair or deceptive" within the meaning of c. 93A, § 9. Our analysis of the immateriality or unimportance of the undisclosed litigation nullifies the claim of actionable deception. Nor, more broadly, was the omission otherwise unfair. The standard of c. 93A unfairness calls for an assessment, in the total circumstances, (1) whether the challenged conduct falls within "the penumbra of . . . common-law, statutory, or other established concept[s] of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers[,] . . . competitors[,] or other business[es]." *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). See, e.g., *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 778 (1986); *Heller Financial* v. *Insurance Co. of N. America*, 410 Mass. 400, 408 (1991). Statutory unfairness may materialize in the absence, and therefore independently, of common-law wrongdoing, inequitable conduct, or other statutory violation. See, e.g., *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975); *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235-236 (1984); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 27, cert. denied, 522 U.S. 1015 (1997); *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 356 (1985); *Zayre Corp.* v. *Computer Sys. of America, Inc.*, 24 Mass. App. Ct. 559, 570-571 (1987). The absence of separate liability is indicative, but not determinative, of the absence of c. 93A liability.

In this instance that negative indication is persuasive. The record does not leave a genuine issue of material fact of statutory unfairness. The motion judge correctly entered summary judgment on the c. 93A claim.

*Judgment affirmed.*