NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11872

BURBANK APARTMENTS TENANT ASSOCIATION & others[1]  vs.  WILLIAM M. KARGMAN[2] & others.[3]


Suffolk.     December 8, 2015. - April 13, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Housing.  Fair Housing Act.  Anti-Discrimination Law, Housing.


Civil action commenced in the Boston Division of the Housing Court Department on March 16, 2011.

A motion to dismiss was heard by Jeffrey M. Winik, J.

The Supreme Judicial Court granted an application for direct appellate review.

_____

[1] Satisha Cleckley, En Ci Guan, Richard Webster, Byron Alford, Massachusetts Coalition for the Homeless, and Fenway Community Development Corporation.

[2] Individually and in his capacities as principal of Burbank Apartments Corp. and First Realty Management Corp.

[3] Robert M. Kargman, individually and in his capacity as principal of Burbank Apartments Corp.; Burbank Apartments Company; Burbank Apartments Corp., as general partner of Burbank Apartments Company; and First Realty Management Corp.

Ann E. Jochnick (James M. McCreight with her) for the plaintiffs.

Janet Steckel Lundberg for the defendants.

The following submitted briefs for amici curiae:

John Cann, of Minnesota, for Sargent Shriver National Center on Poverty Law & others.

Harry J. Kelly & Joshua S. Barlow for Greater Boston Real Estate Board & others.

Joseph D. Rich & Thomas Silverstein, of the District of Columbia, Oren M. Sellstrom, of California, & Laura Maslow-Armand for Lawyers' Committee for Civil Rights Under Law & another.

John J. McDermott, of Virginia, & Eleftherios Papadopoulos for National Apartment Association & another.

Esme Caramello, Louis Fisher, Erika Johnson, Aditya Pai, & Katie Renzler for Fair Housing Center of Greater Boston & others.

Roberta L. Rubin, Special Assistant Attorney General, for Department of Housing & Community Development.

CORDY, J.  This case arises out of a decision made by the defendants, the principals and owners of Burbank Apartments (Burbank), not to renew Burbank's project-based Section 8 housing assistance payments contract (HAP) with the United States Department of Housing and Urban Development (HUD) when its forty-year mortgage subsidy contract expired on March 31, 2011.  In lieu of those project-based subsidies, the defendants opted instead to accept from its tenants Section 8 enhanced vouchers, enabling tenants living in units subsidized on a project basis to remain as tenants under an alternative Federal housing program.[4]  See 42 U.S.C. § 1437f (2012).

---

[4] The Section 8 subsidy program, 42 U.S.C. § 1437f (2012), is a voluntary program by which eligible low income families are able to affordably rent housing units from private property

The plaintiffs, comprised of current and potential Burbank tenants, complained that Burbank's decision violated § 3604 of the Federal Fair Housing Act (FHA or Title VIII), 42 U.S.C. §§ 3601 et seq. (2012), and the Massachusetts antidiscrimination law, G. L. c. 151B, § 4, both by virtue of intentional discrimination as well as disparate impact on members of otherwise protected classes of citizens. In particular, the plaintiffs alleged that the defendants' decision not to renew their HAP would have a disproportionately negative effect on people of color, the disabled and elderly, female-headed households, recipients of public and rental assistance, and families with children (collectively, members of protected classes).

In March, 2011, the plaintiffs moved to enjoin the defendants from allowing Burbank's project-based HAP to lapse; the defendants demurred, and a Housing Court judge (motion judge) denied the injunction. The plaintiffs filed an amended complaint in June, 2011, which the defendants moved to dismiss for failure to state a claim, pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), and oral arguments were held on January 25, 2012. On December 31, 2014, the motion judge

---

owners using rent subsidies from the Federal government. See Figgs v. Boston Hous. Auth., 469 Mass. 354, 362 (2014).

granted the defendants' motion to dismiss.  The plaintiffs appealed.

The plaintiffs' housing discrimination claims, based on the theory of disparate impact, raise an issue of first impression in Massachusetts concerning the relationship among Section 8, the FHA, and the Massachusetts antidiscrimination statute (together the fair housing statutes).  Specifically, can a private building owner's decision not to renew participation in the project-based Section 8 subsidy program in favor of tenant-based Section 8 subsidies be the basis of a disparate impact claim when such decision was otherwise permitted by both Federal and State statutes, as well as by contract?  And, if so, what are the pleading requirements for making out such a claim?

In his comprehensive memorandum of decision and order, the motion judge determined that a disparate impact claim under these circumstances is not legally cognizable, and never reached the second question.  Subsequently, the United States Supreme Court released its decision in Texas Dep't of Hous. & Community Affairs v. The Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2525 (2015) (Inclusive Communities), holding that claims, such as this one, based on the theory of disparate impact are generally cognizable under the FHA.  We granted the plaintiffs' application for direct appellate review to consider their allegations in the context of the FHA, as well as the potential

for similar claims under Massachusetts antidiscrimination law, and to examine the impact of the Inclusive Communities decision.

We affirm the decision of the motion judge granting the motion to dismiss, although on somewhat different grounds.  We conclude that even where the property owner has acted in accord with statute, regulation, and contract, a disparate impact claim under the fair housing statutes can be brought, subject to rigorous pleading requirements.  The plaintiffs in the present case, however, have not satisfied those requirements.[5]

1.  Background.  a.  Statutory background.  In 1965, Congress, under the auspices of the National Housing Act of 1934, approved a mortgage insurance program known as § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715l(d)(3) (2012).  See 12 U.S.C. § 1701s(a).  Pursuant to § 221(d)(3), which was "designed to assist private industry in providing housing for low and moderate income families and displaced families," 12 U.S.C. § 1715l(a), HUD can offer below market interest rate

---

[5] We acknowledge the amicus briefs submitted by the Greater Boston Real Estate Board, the National Leased Housing Association, the National Affordable Housing Management Association, and the Massachusetts Association of Realtors; the National Apartment Association and the National Multifamily Housing Council; the Sargent Shriver National Center on Poverty Law, Housing Justice Center, and National Housing Trust; the Department of Housing & Community Development; Lawyers' Committee for Civil Rights Under Law and Lawyers' Committee of Civil Rights and Economic Justice; and the Fair Housing Center of Greater Boston, the Boston Tenant Coalition, City Life/Vida Urbana, and the Harvard Legal Aid Bureau.

(BMIR) mortgage loans to private property owners in exchange for an agreement from those owners to provide affordable housing.[6] See 12 U.S.C. § 1715l(d)(3). The regulatory agreements, and the attached mortgages, may have up to forty-year terms, 12 U.S.C. § 1701s(a), but permit the owners to opt to pay down those mortgages and withdraw from the program after twenty years. 12 U.S.C. § 1715l(g)(4)(A).

The Section 8 housing program was enacted in 1974 for the purpose of "aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a).[7] See Figgs v. Boston Hous. Auth., 469 Mass. 354, 362 (2014); Feemster v. BSA Ltd. Partnership, 471 F. Supp. 2d 87, 91 (D. D.C. 2007), aff'd, 548 F.3d 1063 (D.C. Cir. 2008). Housing assistance through Section 8 is obtained through either "tenant-based" or "project-based" subsidies. 24 C.F.R. § 982.1(b)(1) (2015). Both forms are funded by the Federal government and administered by State or local public housing agencies (PHAs). See 42 U.S.C. § 1437f(a); 24 C.F.R.

---

[6] At the time of the defendants' initial agreement under § 221(d)(3) of the National Housing Act, 12 U.S.C. § 1715l(d)(3), the United States Federal Housing Administration, a predecessor to the United States Department of Housing and Urban Development, was responsible for insurance under § 221(d)(3).

[7] We are aware that 42 U.S.C. §§ 1437a and 1437f were amended in December, 2015. The amendments do not apply to the portions of the statutes relevant to this case. See Pub. L. No. 114-94.

§ 982.1(a)(1). For project-based assistance, the "rental assistance is paid for families who live in specific housing developments or units." 24 C.F.R. § 982.1(b)(1). Tenant-based assistance, on the other hand, is appurtenant to the tenant, and the "assisted unit is selected by the family," so that the tenant may opt to "rent a unit anywhere . . . in the jurisdiction of a PHA that runs a voucher program." Id. See 42 U.S.C. §§ 1437f(r); 24 C.F.R. §§ 982.353(a) (2010), 982.355(a) (2015). After Congress enacted the Section 8 program in 1974, many of the units built with the assistance of the § 221(d)(3) mortgage program were transferred to project-based Section 8 rent subsidies, including many of those at Burbank. See Feemster, supra.

In 1987, and in response to subsequent concerns that owners operating under § 221(d)(3) regulatory agreements were opting to pay down their mortgages early and opt out of the Section 8 program, see Franconia Assocs. v. United States, 536 U.S. 129, 136 (2002), citing H. R. Rep. No. 100-122, at 53 (1987) (interpreting 1994 version of 42 U.S.C. § 1472[c][4][B]). Congress enacted the Emergency Low-Income Housing Preservation Act of 1987 (ELIHPA) to provide incentives for continued participation by property owners. Franconia Assocs., supra, citing 42 U.S.C. § 1472(c)(4)(B) (1994 ed. and Supp. V). Congress also later provided further protection for tenants,

including eligibility for tenant-based vouchers on the expiration of a project-based HAP. 12 U.S.C. § 4113 (2012). Pursuant to that statute, where an owner opted to terminate or discontinue project-based subsidies, low income tenants in the units previously subject to that program automatically would be eligible for Section 8 mobile vouchers, see 12 U.S.C. § 4113(a), and, in some instances, enhanced vouchers. See 12 U.S.C. § 4113(f). Further, property owners opting out of project-based subsidies -- but continuing to maintain the property for residential rental occupancy -- are required to accept the tenant-based Section 8 subsidies for which their tenants were automatically eligible. 12 U.S.C. § 4113(d).

In 2009, the Legislature enacted cognate legislation, G. L. c. 40T (c. 40T), which addresses the rights and obligations of owners operating with project-based Section 8 subsidies. See G. L. c. 40T, § 1. See also St. 2009, c. 159, § 1. Like the equivalent Federal statutes, c. 40T provides substantive protections for tenants previously occupying units covered by project-based subsidies. See, e.g., G. L. c. 40T, §§ 2 (b), 7. See also 42 U.S.C. § 1437f(c)(8)(B). Also consonant with Federal law, however, c. 40T does not restrict owners from prepaying their mortgages or opting out of their subsidy contracts after doing so. See G. L. c. 40T, § 2 (a) ("Nothing

herein shall prohibit the owner from taking actions to terminate an affordability restriction").

The distinctions between project-based and tenant-based subsidies (and among the various tenant-based subsidies themselves) are not insignificant.  Generally, all Section 8 tenants contribute a portion of their income to the rent based on an income indicator, amounting to the higher of thirty per cent of their monthly adjusted income or ten per cent of their monthly gross income.[8]  See 42 U.S.C. §§ 1437f(o)(2)(A), 1437a(a)(1).  There are, however, variations on the general scheme depending on the subsidy program, including who is responsible for determining a unit's rental price.  For project-based entities, the PHA is responsible for setting rental prices for specific units.  See 24 C.F.R. §§ 983.301 (2014), 983.302 (2006).[9]

Rental prices for tenants holding tenant-based vouchers, on the other hand, are negotiated between the owner and the tenant.  24 C.F.R. § 982.506 (1999).  The Secretary of HUD sets a "payment standard" applicable to the units selected by the tenant, based on the fair market rental value of the unit, and

---

[8] Gross income is all income, while adjusted income is gross income minus deductions and allowances.  See 24 C.F.R. § 5.611 (2000).

[9] The PHA will redetermine the rent value upon request of the owner or after a decrease in the unit's fair market value.  24 C.F.R. § 983.302 (2006).

in accordance with HUD regulation.  See 42 U.S.C. § 1437f(o)(1)(A)-(B).  Where the rent established in negotiation between the owner and the tenant exceeds the established payment standard, the PHA will pay only the difference between the income indicator and the payment standard, as opposed to the rental value, meaning that holders of tenant-based vouchers may be subject to paying a greater portion of their income than tenants living in project-based units.  See id. at § 1437f(o)(2)(B).

Enhanced vouchers, a more protective variation on the tenant-based subsidy, insulate holders from these rent variances, as their rent payments are still determined based on the difference between the income indicator and the rent, even if that rent exceeds the payment standard.  Id. at § 1437f(t)(1)(B).  In either tenant-based subsidy scenario, however, the rental value negotiation between an owner and tenant-based subsidy holder is subject to PHA approval, meaning that PHAs can opt not to approve a rental agreement and refuse to pay the subsidy if the PHA determines that the rent is not "reasonable."  See 24 C.F.R. § 982.507 (2014); 42 U.S.C. § 1437f(o)(10)(B).  Because rents are established by the PHA under the project-based subsidy program, tenants living in

project-based units are not subject to any reasonableness determination.[10]

b. Factual and procedural background.[11] The seven named plaintiffs in the amended complaint are an amalgamation of current Burbank tenants, prospective tenants, and organizations that represent the interests of other Burbank tenants and more prospective Burbank residents in the community. The four individual plaintiffs, En Ci Guan, Richard Webster, Byron Alford, and Satisha Cleckley, are all members of protected classes. Prior to the defendants' decision not to renew their Section 8 HAP, Guan and Webster lived in units supported by Section 8 project-based subsidies. Alford was a resident of a Burbank unit not supported by the Section 8 project-based subsidy, and Cleckley was a nontenant who had sought to apply for an apartment at Burbank. Neither Alford nor Cleckley was ever in receipt of the project-based subsidy. The individual plaintiffs claimed that the decision to allow the project-based subsidy to lapse discriminates against current Burbank tenants

---

[10] Tenants with tenant-based subsidies may also be subject to rescreening for eligibility. See 42 U.S.C. § 1437f(o)(6)(B). This is not true for tenants living in units supported by project-based subsidies. 24 C.F.R. § 983.255 (2010).

[11] We draw the facts from the allegations in the complaint, as well as exhibits attached thereto, which we accept as true, and matters of public record. See Ortiz v. Examworks, Inc., 470 Mass. 784, 785 n.3 (2015); Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000).

and potential Burbank tenants in the Fenway community.  The three organizational plaintiffs, Burbank Apartments Tenant Association, made up of tenants who reside at Burbank; the Massachusetts Coalition for the Homeless, a nonprofit corporation that works with homeless individuals and families; and the Fenway Community Development Corporation, a nonprofit corporation devoted to enhancing diversity in the Fenway neighborhood, alleged that the loss of low income housing at Burbank would harm the neighborhood.  The defendants are the principals and owners of Burbank.[12]

Burbank is a scattered site 173-unit rental development located in the Fenway neighborhood of Boston.  Beginning in 1970, the defendants began renovation of Burbank with the assistance of a federally insured and subsidized § 221(d)(3) BMIR mortgage loan.  See 12 U.S.C. § 1715l(d)(3).  Pursuant to their regulatory agreement with HUD, the defendants were obligated to lease the Burbank apartments to low or moderate income families for "so long as the contract of mortgage insurance continues in effect."  The defendants' mortgage was to

---

[12] Burbank Apartments is owned and managed by defendant Burbank Apartments Company.  Burbank Apartments Corporation is the general partner of Burbank Apartments Company; First Realty Management Corporation manages Burbank Apartments on behalf of Burbank Apartments Company; William K. Kargman is principal of Burbank Apartments Corporation and First Realty Management Corporation; and Robert M. Kargman is principal of Burbank Apartments Corporation.

be fully paid by April 1, 2011, with prepayment of the mortgage permitted as of April 1, 1991.

In 1982, the eligible tenants occupying Burbank's units began to receive support from project-based Section 8 subsidies.[13]  Sixty-seven of the 173 units were designated as project-based Section 8 units.

The defendants opted not to prepay their loan in 1991. Instead, they signed an ELIPHA use agreement[14] in 1994, specifying that HUD "shall not require the [defendants] to renew or extend any assistance contract beyond [April 1, 2011,] and shall not subject the [defendants] to more onerous requirements than those which exist under the Section 8 program."  The use agreement remained in effect for the balance of the HAP.

In 2010, the defendants provided a one-year notice of expiration to HUD and the subsidized tenants at Burbank, as required by both Federal and State statute.[15]  See 42 U.S.C. § 1437f(c)(8); G. L. c. 40T § 2 (b).  As of April, 2011 (when the HAP ended), tenants in 129 of the 173 units at Burbank

---

[13] Prior to 1982, low income tenants at Burbank received rental assistance under a predecessor to the Section 8 program.

[14] The agreement provided that sixty-seven units would be set aside to very low income families; seventy-five units for lower income families; and twenty-eight units to moderate income families (allotting affordability restrictions on 170 of the 173 units).

[15] Notice was sent in February, March, and May, 2010.  It is undisputed that the defendants satisfied the notice requirement.

(including each of the three individual plaintiffs who were existing tenants) were deemed eligible for the enhanced voucher program.[16]  As a consequence of Burbank's decision to leave the project-based subsidy program, the Boston Housing Authority obtained funding for a total of 171 new Section 8 enhanced vouchers, which can be retained by the city of Boston regardless of whether they would be used at Burbank.

As alleged in the complaint, Burbank tenants, including those receiving Section 8 subsidies, are, on average, more diverse than the surrounding neighborhood, and have a lower income than the area median.  For example, as of December 16, 2010, sixty-five per cent of the Section 8 households at the development had heads of household who were either persons of color, Hispanic, or both.  On the other hand, the population of the Fenway zip code area is sixty-six per cent white, and the immediate census tract is seventy-three per cent white and only six per cent African-American.  In addition, the majority of prospective tenants who were on the waiting list for project-based Section 8 units at Burbank were members of protected classes.  As of December, 2009, two-thirds of the prospective tenants on the waiting list were persons of color, and in

_____

[16] In addition to the tenants occupying the sixty-seven units that were previously part of the project-based Section 8 program, sixty-two other Burbank apartments also were deemed eligible to receive Section 8 enhanced vouchers due to the defendants' decision not to renew the project-based subsidies.

December, 2010, only one of the responding eighty prospective tenants on the waiting list identified himself or herself as "white."

The plaintiffs' amended complaint raised two claims. The first count alleged subsidy discrimination, in violation of G. L. c. 151B, § 4 (10), because Guan and Webster, who were receiving the project-based subsidies prior to April 1, 2011, would no longer be eligible for such subsidies. Further subsidy discrimination was alleged under G. L. c. 151B, § 4 (5) and (10), because applicants and prospective applicants for the project-based units, including Cleckley and Alford, claimed that the defendants' decision rendered them ineligible for a sufficient housing subsidy, and they are therefore unable to afford market rents at Burbank.

The second count alleged that the defendants' decision not to renew the HAP was unlawful because it was discriminatory, based on both disparate treatment and disparate impact, in violation of G. L. c. 151B, § 4, and 42 U.S.C. § 3604.

The judge granted the defendants' motion to dismiss both counts of the amended complaint, pursuant to Mass. R. Civ. P. 12 (b) (6), for failure to state a claim on which relief can be granted. With respect to the first count, subsidy discrimination under G. L. c. 151B, § 4 (10), the judge ruled that the defendants "lawfully transitioned from one form of

Section 8 subsidy (project-based) to another form of Section 8 subsidy (individual enhanced Section 8 vouchers) as [they were] permitted to do under [F]ederal law."  The tenant plaintiffs were therefore not unlawfully discriminated against when they received the enhanced vouchers as opposed to the project-based subsidies.  The judge dismissed the prospective applicants' G. L. c. 151B, § 4 (10), claims as too speculative and indefinite.

As for the second count, the judge dismissed the claim for intentional discrimination (a ruling that the plaintiffs have not appealed), and adopted a per se rule that precludes disparate impact liability where the decision not to renew a project-based subsidy was reached in compliance with applicable statutes and regulations.

2.  Discussion.  We review the allowance of a motion to dismiss de novo, accepting as true the facts alleged in the plaintiffs' amended complaint and exhibits attached thereto, and favorable inferences that reasonably can be drawn from them, see Coghlin Elec. Contractors, Inc. v. Gilbane Bldg. Co., 472 Mass. 549, 553 (2015).  We also take into consideration matters of public record.  See Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000).  Those alleged facts, and reasonable inferences drawn therefrom, must plausibly suggest an entitlement to relief.  See Flagg v. AliMed, Inc., 466 Mass. 23, 26-27 (2013), quoting

Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008). The facts, therefore, "must be enough to raise a right to relief above the speculative level." Iannacchino, supra, quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (Twombly). While "detailed factual allegations" are not required at the pleading stage, mere "labels and conclusions" will not survive a motion to dismiss. Iannacchino, supra, quoting Twombly, supra.

On appeal, the plaintiffs pursue a discrimination claim because, as they argue, the defendants' decision has -- and inevitably will continue to -- challenge integration efforts and perpetuate the segregation that has plagued Boston, generally, and the Fenway neighborhood, specifically.[17] The plaintiffs argue that the defendants' decision not to renew their HAP subjects the defendants to subsidy discrimination, in violation of G. L. c. 151B, § 4 (10); and housing discrimination, in violation of 42 U.S.C. §§ 3604(a), (b) and G. L. c. 151B, §§ 4 (6), (7), and (11). Neither shoe fits.[18]

---

[17] According to a Boston Globe article summarizing the findings of the 2015 Harvard Joint Center for Housing Studies report, "[d]evelopers aren't building enough units suitable for families or for senior citizens, and high development costs make it hard to produce new housing that a low- or middle-income renter can afford." Study Finds Rents Soaring as Apartment Supply Lags, Boston Globe, Dec. 10, 2015, at C3.

[18] The defendants' argument that § 4122(a) of the Low-Income Housing Preservation and Resident Home Ownership Act of 1990, 12 U.S.C. §§ 4101 et seq. (prohibiting any State law that "[1] restricts or inhibits the payment of any mortgage . . . ; [2]

a.  Subsidy discrimination under G. L. c. 151B, § 4 (5), (10).  The plaintiffs, in the first count of their complaint, contend that the defendants' decision not to renew the project-based Section 8 subsidies constitutes public assistance discrimination under G. L. c. 151B, §§ 4 (5) and (10).

It is "an unlawful practice . . . to discriminate against any . . . tenant receiving [F]ederal, [S]tate, or local housing subsidies . . . because of any requirement of such . . . housing

restricts or inhibits an owner . . . from receiving the authorized annual return . . . ; [or] [3] is inconsistent with any provision of this subchapter") preempts G. L. c. 151B, § 4 (10), is inapposite.  The defendants argue that G. L. c. 151B, § 4, is preempted both by express preemption and by conflict preemption.  Neither applies in this case.  The express preemption argument is overcome by 12 U.S.C. § 4122(b), which makes clear that the policy covered in § 4122(a) does not affect laws of general applicability, such as State fair housing laws, which are "not inconsistent with the provisions of this subchapter."  Nothing in G. L. c. 151B, § 4, is inconsistent with Federal law.  See, e.g., Attorney Gen. v. Brown, 400 Mass. 826, 829-830 (1987) ("Both G. L. c. 151B, § 4 [10] and 42 U.S.C. § 1437f [1982] share a common goal, i.e., affordable, decent housing for those of low income"; no preemption of G. L. c. 151B, § 4 [10]).  The conflict preemption argument can likewise be disposed of by our case law.  See id. at 830 ("The Federal statute merely creates the scheme and sets out the guidelines for the funding and implementation of the program. . . .  It does not preclude State regulation").

The defendants also argue that G. L. c. 151B, § 4 (10), would constitute an unconstitutional regulatory taking under the Fifth Amendment to the United States Constitution.  We reject this argument, because even if we were to determine that G. L. c. 151B, § 4, precluded the defendants from deciding not to renew their project-based subsidy contract, the defendants still would "continue to derive significant economic benefit from their property as a whole."  Blair v. Department of Conservation and Recreation, 457 Mass. 634, 645 (2010).

subsidy program," G. L. c. 151B, § 4 (10), or to "aid[ or] abet" such a violation.[19] G. L. c. 151B, §§ 4 (5), (10). See DiLiddo v. Oxford St. Realty, Inc., 450 Mass. 66, 78 (2007). General Laws c. 151B, § 4 (10), has the goal of providing "affordable, decent housing for those of low income." Attorney Gen. v. Brown, 400 Mass. 826, 830 (1987). "[T]he decision not to enroll in a voluntary governmental program by itself [does not] constitute[] unlawful discrimination under G. L. c. 151B, § 4 (10)." Hennessey v. Berger, 403 Mass. 648, 652 (1988). However, the voluntary nature of a program does not preclude the application of State law "mandating participation [in the voluntary Federal program] absent some valid nondiscriminatory reason for not participating." Brown, supra.[20] In short,

---

[19] Paragraph ninety-six of the plaintiffs' complaint alleges subsidy discrimination under G. L. c. 151B, § 4 (5), along with § 4 (10). A case finding a defendant liable for subsidy discrimination under § 4 (5)'s "aid[ing or] abet[ing]" language alone has neither been called to our attention nor disclosed by our own research; we will therefore consider the subsidy discrimination claim under § 4 (5) only as a base line for the § 4 (10) claim.

[20] We recognize that the defendants' use agreement specifically provided that it "shall not require the [defendants] to renew or extend any assistance contract beyond [April 1, 2011,] and shall not subject the [defendants] to more onerous requirements than those which exist under the Section 8 program." Federal and State statutes likewise indicate that the defendants were under no legal obligation to renew or enter into a new project-based HAP contract when the use agreement ended. See 42 U.S.C. § 1437f(c)(8)(A) (providing protections for tenants after project-based subsidies end, and therefore

although the defendants are not obligated to participate in the project-based subsidy program, that fact alone does not shield them from an adequately pleaded claim. The plaintiffs, however, have failed to adequately plead such a claim.

The plaintiffs' subsidy discrimination claim plays out differently for the various groups. We begin with the claim made by Guan.[21] His claim relies largely on the assertion that he will be injured by the change in subsidy program because the enhanced vouchers he received are less favorable than the project-based subsidies. Beyond bare "labels and conclusions," Iannacchino, 451 Mass. at 636, quoting Twombly, 550 U.S. at 555, the plaintiffs allege no facts to suggest that the decision to opt out of the project-based subsidy program violated the fair housing statutes or was discriminatory in nature. Every participant in the project-based subsidy program prior to its nonrenewal was deemed eligible for an enhanced voucher, which the defendants accepted and encouraged their tenants (both those

---

indicating that Federal government recognized that programs would eventually end); G. L. c. 40T §§ 2 (a), 7 (same).

[21] Richard Webster, who was, like En Ci Guan, living in a unit supported by project-based subsidies, passed away during pendency of the case, or he would have been included in this group.

formerly part of the project-based program and those who were not but received enhanced vouchers) to continue to use.[22]

This case does not present a situation in which the property owner has placed a barrier on tenancy due to the proffer of a certain form of subsidy, and not provided for an alternative means to remain in the unit. Contrast DiLiddo, 450 Mass. at 72. Instead, it is the lawful replacement of one form of subsidy (project-based) with another (tenant-based), both of which allowed the tenants to remain in their units. It is indeed telling that every former participant in the project-based subsidy -- including Guan -- continued to occupy his or her unit after the HAP lapsed, relying instead on the tenant-based enhanced voucher subsidies. It is therefore apparent that the defendants were willing to accept, as the Federal statute requires, and even accommodate, tenants who were receiving housing subsidies.

Moreover, it is not apparent that receipt of the enhanced vouchers has, or will, disadvantage these plaintiffs.[23] At any

---

[22] The February 18, 2010, notification sent to the tenants by the defendants explicitly stated that "[w]e want our residents to stay at Burbank Apartments" and that "[t]he owners and staff are working to provide assistance to our residents."

[23] Allegations in the complaint imply that the protection afforded low income tenants by enhanced vouchers are not equivalent to that offered by project-based subsidies. Those allegations include that the enhanced vouchers lose their enhanced status if the tenant leaves Burbank, that tenants can

rate, even if we were to assume that receipt of the project-based subsidies is more favorable than the enhanced vouchers, what the law requires is that the defendants not discriminate against public assistance recipients in general, not that they must provide the best -- or any particular -- form of rental assistance.

The next group consists of the nonparticipating plaintiffs, Alford and Cleckley. These plaintiffs allege that the decision not to renew the project-based subsidy constituted discrimination because they sought to apply for the project-based subsidy. They further allege that they and others will be excluded from Burbank at some time in the future, whether or not they have tenant-based subsidies.

We agree with the motion judge that these plaintiffs have failed to state a claim under G. L. c. 151B, §§ 4 (5) and (10).

---

be deemed ineligible for the enhanced vouchers, that the units in which tenants were previously living would no longer be subsidized, and that they are more politically vulnerable, more likely to be the target of budget cuts, and have more detrimental program rules. Such allegations are, as they apply to the to the participating tenant plaintiffs, both speculative and indefinite in nature. See Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (Twombly). The plaintiffs also allege that tenants using tenant-based subsidies are subject to a greater extent to fluctuations in rent prices. However, nothing in the complaint indicates that the defendants raised the rental value beyond any level of reasonableness, such that a PHA may opt not to approve the lease or cover the rent. In any event, these concerns border on being "labels and conclusions," which carry less weight in our analysis. See Iannacchino, supra, quoting Twombly, supra.

It is not only the speculative and indefinite nature of the claims that is their death knell.  Simply put, the complaint contains no allegations that the defendants have discriminated against any tenant receiving Section 8 subsidies, or that the defendants have refused to consider the applications of prospective tenants because of such subsidies.  As to the allegation that the defendants will no longer accept the project-based subsidies, which these plaintiffs claim may be the basis of their claim of subsidy discrimination, those subsidies are appurtenant not to the tenant (or prospective tenant), but to the rental unit.[24]

The plaintiffs have therefore failed to allege facts "plausibly suggesting," Iannacchino, 451 Mass. at 636, quoting Twombly, 550 U.S at 555, that the defendants' decision violated G. L. c. 151B, §§ 4 (5) or (10).  The defendants did not discriminate against "a tenant receiving" a housing subsidy, but instead lawfully transitioned from one form of Section 8 subsidy to another, as is permitted under the Federal regulations.

b.  Discriminatory housing accommodation.  The plaintiffs take issue with the motion judge's determination that the defendants' decision not to renew their HAP contract is immune from a disparate impact challenge under the fair housing

---

[24] This same analysis precludes Cleckley's "independent basis" for relief under G. L. c. 151B, § 4 (10), for discrimination against a "recipient of . . . public assistance."

statutes.  They contend that precluding such a claim would be akin to reading an unwarranted exception for otherwise legal nonrenewal of a Section 8 HAP into the overriding discrimination proscriptions of the fair housing statutes.  We agree.

i.  Disparate impact claims under the FHA and the cognate Massachusetts fair housing statute.  Disparate impact occurs when a decision "disproportionately disadvantage[s]" members of a protected class.  See Lopez v. Commonwealth, 463 Mass. 696, 712 (2012).  See also Inclusive Communities, 135 S. Ct. at 2513, 2521.  There is no "single test" to demonstrate disparate impact.  Langlois v. Abington Hous. Auth., 207 F.3d 43, 50 (1st Cir. 2000).

We begin with the general framework for Federal housing discrimination claims pursuant to the FHA.  Claims under the FHA may be alleged under either disparate treatment or disparate impact theories.  See Inclusive Communities, 135 S. Ct. at 2518, 2524-2525 (extrapolating disparate impact theory under Title VIII from similar precedent, set by Griggs v. Duke Power Co., 401 U.S. 424, 431 [1971], construing Federal employment discrimination statute claims under Title VII).  However, while the Supreme Court has concluded that discrimination claims based on a disparate impact theory may be brought under the FHA, we have yet to determine whether such a fair housing claim could also be pleaded based on discriminatory impact under the

Commonwealth's antidiscrimination law.  We conclude that such a claim is cognizable.

In School Comm. of Braintree v. Massachusetts Comm'n Against Discrimination, 377 Mass. 424 (1979) (Braintree), we recognized that, like Title VII, the Massachusetts employment discrimination statute, G. L. c. 151B, § 4 (1), "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation."  Id. at 429 n.10, quoting Griggs, supra.  We later expanded our disparate impact jurisprudence to claims under G. L. c. 151B, § 4A (interference claims).  See Lopez, 463 Mass. at 710-711.  Although we have not considered whether disparate impact claims apply to G. L. c. 151B, § 4, in its entirety, the Appeals Court has further broadened disparate impact application to other subsections of G. L. c. 151B.  See Porio v. Department of Revenue, 80 Mass. App. Ct. 57, 68-69 (2011) (reviewing disparate impact claim under § 4 [1C]).

Our decision to amplify our disparate impact analysis derives from the language of the statute and the purpose of our housing discrimination laws, which, like those preventing employment discrimination, seek to eradicate discrimination in all its forms, be they based on intent or effect. "[A]ntidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the

consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." Inclusive Communities, 135 S. Ct. at 2518. General Laws c. 151B, §§ 4 (6), (7) and (11), prohibit conduct that results in a "refus[al] to rent or lease or sell or negotiate for sale" on the basis of membership in a protected class. This language indicates that it is not only the intent behind discriminatory housing actions that the Legislature sought to punish, but also the consequences of such actions.

Our conclusion is also tethered to the policy underlying the fair housing statutes. See Inclusive Communities, supra at 2521 ("[r]ecognition of disparate-impact claims is consistent with the FHA's central purpose"). After all, it is a steadfast principle in the affordable housing context that "[c]onduct that has the necessary and foreseeable consequence of perpetuating segregation can be as deleterious as purposefully discriminatory conduct in frustrating the national commitment to replace the ghettos by truly integrated and balanced living patterns" (quotation and citation omitted). Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1289 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978). Therefore, just as the Supreme Court deduced, based on precedent from Title VII, that a disparate impact theory of liability could appropriately be brought under Title VIII in the housing context, we too

conclude from our employment discrimination precedent that such a theory of liability is cognizable under G. L. c. 151B, §§ 4 (6), (7), and (11).

ii. Disparate impact claims under fair housing statutes where the defendant acted in accord with law. Having concluded that disparate impact claims are generally cognizable under the fair housing statutes, we must determine whether they may arise in the context before us. The defendants urge us to embrace a per se rule precluding disparate impact liability under the fair housing statutes where a property owner has acted in accord with statute, regulation, and contract, absent evidence of intentional discrimination. We decline to adopt such a rule.

Our analysis begins again with the policy behind the fair housing statutes, namely, to "provide[] a clear national policy against discrimination in housing." H. R. Rep. No. 100-711, 100th Cong., 2d Sess., 15 (1988). See 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States"); G. L. c. 151B, § 9 (Commonwealth's antidiscrimination statutes, including its fair housing statutes, "shall be construed liberally for the accomplishment of its purposes, and any law inconsistent with any provision of this chapter shall not apply"). See also Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 211 (1972) (FHA

implements "policy that Congress considered to be of the highest priority"); Massachusetts Bay Transp. Auth. v. Boston Carmen's Union, Local 589, Amalgamated Transit Union, 454 Mass. 19, 26 (2009) (antidiscrimination policy under G. L. c. 151B is "well defined and dominant" and "the overriding governmental policy proscribing various types of discrimination"); Dahill v. Police Dep't of Boston, 434 Mass. 233, 241 (2001) ("We construe G. L. c. 151B, § 4, to . . . the fullest effect").  The statute's "broad and inclusive compass," therefore, is accorded "generous construction" (quotations omitted).  Edmonds v. Oxford House, Inc., 514 U.S. 725, 731 (1995), quoting Trafficante, supra at 209, 212.

Our canons of statutory construction militate toward the same result.  The defendants argue that, where "a general statute and a specific statute cannot be reconciled, the general statute must yield to the specific statute" (citation omitted). Hennessey, 403 Mass. at 651.  They also assert that we must give full effect and force to the legislative intent in managing the subsidy program, such that property owners would have some flexibility in choosing to eschew participation in the Section 8 subsidy program.  This would require a determination that the specific statutes (those allowing for nonrenewal of project-based HAPs) take precedence over general fair housing policies (against discrimination in housing).  The judge below agreed,

determining that, although the general policy behind the fair housing statutes is to stamp out discrimination, Congress and the Legislature indicated a specific intent to manage the manner in which the Federal subsidy programs should be operated.

But support for such an interpretation is not so clear cut. Although a fundamental precondition to satisfying the goals of the fair housing statutes is incentivizing private owners, through federally subsidized loans and tax breaks, to offer affordable housing,[25] it is also a goal to ensure that such programs and the private owners they subsidize do not act in a discriminatory manner with regard to such housing. It is a balance of those interests that Congress and the Legislature sought to strike with the fair housing statutes and regulations.

Adopting a bright-line rule prohibiting disparate impact liability where a property owner follows the project-based

---

[25] This goal has become increasingly important recently in Boston. See City Will Raise its Fees on Builders, Boston Globe, Dec. 9, 2015, at A1 ("Developers will have to pay nearly double the current fees to put up luxury buildings in Boston's hottest neighborhoods, with the money going to expand the city's stock of affordable housing, according to an executive order to be signed [December 9, 2015,] by Mayor Martin J. Walsh"); Lower Price Housing On Rise, Boston Globe, July 7, 2015, at A1 ("So far in 2015, the city has permitted 450 units of low-income families, up 25 percent from the same period last year"); Boston's Struggle With Income Segregation, Boston Globe, March 6, 2016, at A1 ("In 1970, just 8 percent of families in Boston and the surrounding cities and towns lived in the poorest neighborhoods. Now, the figure is more than twice as high -- 20 percent. Over the same period, the proportion of families living in the wealthiest neighborhoods has nearly tripled, from 6 percent to 16 percent").

Section 8 statutory scheme, absent evidence of intentional discrimination, would run counter to those policies preventing housing discrimination in all forms that were delineated by both Congress and the Legislature. We will not shoehorn into the fair housing statutes what HUD would describe as an "additional exemption[] [that] would be contrary to Congressional intent." 78 Fed. Reg. 11460, 11477 (2013). See id. at 11460; Inclusive Communities, 135 S. Ct. at 2514 (citing HUD regulations favorably). See also DiLiddo, 450 Mass. at 77 (declining to read exception into G. L. c. 151B, § 4 [10], as contrary to "the statute's clear terms"). Therefore, although the defendants never committed a breach of their Section 8 contract, followed the Federal and State requirements in deciding not to renew the project-based subsidies, and subsequently accepted the enhanced vouchers, this alone does not end the inquiry. Instead, our disparate impact analysis will consider whether such actions were sufficient to insulate protected classes from discriminatory negative impacts the defendants might have caused. Graoch Assocs. No. 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n, 508 F.3d 366, 377 (6th Cir. 2007) (Graoch) ("The mere fact that a landlord often can withdraw from Section 8 without violating the terms of Section 8 or the FHA does not mean that withdrawal from Section 8 never can constitute a violation of the FHA"); Brown, 400 Mass. at 830

("It does not follow that, merely because Congress provided for voluntary participation, the States are precluded from mandating participation absent some valid nondiscriminatory reason for not participating").

We therefore choose not to adopt the motion judge's interpretation. Although, "[i]n the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other," School Comm. of Newton v. Newton Sch. Custodians Ass'n, Local 454, 438 Mass. 739, 751 (2003), we perceive no contrary commands in the fair housing statutes, nor a specific intent supplied to trump the overarching general principle. Indeed, the statutes are harmonious: Congress created a comprehensive incentive program to encourage property owners to continue to offer Section 8 subsidies in order to increase affordable housing. See 42 U.S.C. § 1437f. Because it became obvious that those property owners would inevitably opt to prepay their mortgages -- or eventually not renew their Section 8 contract -- Congress, and then the Legislature, through G. L. c. 40T,[26] again stepped in to ensure that the previously contracted property owners would maintain an efficient, fair, and nondiscriminatory post-HAP

---

[26] In an amicus brief, the Department of Housing & Community Development expresses the policy behind G. L. c. 40T as "both encourag[ing] the continuing existence of affordable housing and protect[ing] tenants in the event that an affordability restriction is terminated."

rental regime. In so doing, a notice requirement was instituted, and Congress obligated the owners to accept the mobile or enhanced vouchers. See 42 U.S.C. § 1437f; G. L. c. 40T, § 2 (b).

The statutes and regulations creating Section 8 contracts, and those regarding ending such contracts, are therefore harmonious in their goals: incentivizing efforts to combat segregation, and protecting residents living in affordable housing while maintaining economical mechanisms by which property owners can effectuate such a purpose. Because the defendants in this case have benefited -- starting with the federally subsidized loans to undertake substantial renovations on Burbank Apartments in the early 1970s -- from the incentives afforded by the Section 8 project-based subsidies, it is incumbent on them, should they choose to eschew such benefits, to do so in a manner that is in conformity with the legislative aspirations based on which they initially entered into the Section 8 contract. This is evidenced by the fact that Congress has provided a program of enhanced vouchers, under which property owners like the defendants must act if they do not renew their HAP. See 12 U.S.C. § 4113(d). This Federal requirement underscores that, although Section 8 participation is initially voluntary, the policy ramifications that attend such participation endure beyond the term of the contract. See

Graoch, 508 F.3d at 376-377 ("[T]o say that Section 8 participation is 'voluntary' is only to say that a landlord does not break the law by declining to participate. . . . [A]lmost every action that could create disparate-impact liability under the FHA is voluntary").[27]

This result is in accord with fair housing precedent, as violating a regulation or breaking the law has never been a prerequisite to disparate impact liability. See, e.g., Graoch, supra at 376 n.5, 377 (court "reject[ed] a categorical rule against disparate-impact challenges to withdrawals" of private property owners from Section 8 voucher program, even though such withdrawal from voluntary program was in accordance with statute and regulation: "[a]lthough Congress created the Section 8 program six years after passing the FHA, . . . it did not include language indicating that Section 8 landlords should be exempt from any FHA requirements"). We therefore do not agree with the judgment below that the defendants' compliance with Federal and State regulations and statutes is a per se bar to disparate impact liability. Instead, we conclude that the

---

[27] We acknowledge the decisions in Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 302 (2d Cir. 1998), and Knapp v. Eagle Prop. Mgt. Corp., 54 F.3d 1272, 1280-1281 (7th Cir. 1995), concluding that disparate impact claims cannot result from an owner's decision not to renew a project-based Section 8 subsidy contract. It is our view, however, that these decisions, in concluding that an action need be otherwise violative of the law before facing a disparate impact claim, ignore the legislative policies behind the fair housing regime.

general and the specific interests of the fair housing statutes are not mutually exclusive, and a disparate impact claim is cognizable even if a defendant who is a private owner adheres to statutory, regulatory, and contractual obligations.

iii. Pleading requirements. Having concluded that disparate impact claims are cognizable under G. L. c. 151B, § 4 (6), (7), and (11), as they are under the FHA, we must now explicate pleading requirements for such claims. In so doing, we will follow the burden-shifting framework laid out by HUD and adopted by the Supreme Court in Inclusive Communities, 135 S. Ct. at 2424-2425.[28] See Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984) (court defers to HUD's implementing regulations as long as they are "permissible construction of the statute"). See also Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460, 11461 (2013); Inclusive Communities, 135 S. Ct. at 2514-2516. The first step in the burden-shifting analysis is germane to the present case. To establish a prima facie case for disparate impact housing discrimination under the FHA, and therefore survive a motion to dismiss, the plaintiffs bear the burden of alleging facts

_____

[28] "When interpreting . . . specific provisions of G. L. c. 151B . . . we consider Federal case law construing cognate provisions of the Fair Housing Act unless we discern a reason to depart from those decisions." Andover Hous. Auth. v. Shkolnik, 443 Mass. 300, 306 (2005).

showing that the "challenged practice caused or predictably will cause a discriminatory effect." Inclusive Communities, supra at 2514, quoting 24 C.F.R. § 100.500 (c) (1) (2014).

The Supreme Court emphasized the need to balance the interests of both property owners and protected classes by requiring a rigorous examination on the merits at the pleading stage. See Inclusive Communities, 135 S. Ct. at 2523. To avoid the risk of "interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision," id. at 2524, courts must "examine with care whether plaintiff[s] ha[ve] made out a prima facie case of disparate impact." Id. at 2523. Fair housing claims based on the theory of disparate impact should therefore be limited to "avoid the serious constitutional questions that might arise." Id. at 2522. Such a showing, for instance, may not be "imposed based solely on a showing of a statistical disparity." Id. More particularly, the plaintiffs cannot satisfy this burden "[i]f a statistical discrepancy is caused by factors other than the defendant's policy." Id. at 2514. Instead, the plaintiffs must meet a "robust causality requirement," id. at 2523, by "point[ing] to a defendant's policy or policies causing that [statistical] disparity." Id. A practice or policy is "contrary to the disparate-impact requirement [if it creates] 'artificial, arbitrary, and unnecessary barriers'" that create

discriminatory effects or perpetuate segregation.  <u>Id</u>. at 2524,

quoting <u>Griggs</u>, 401 U.S. at 431.[29]

_____

[29] The explication of the Supreme Court's pleading requirements established in <u>Texas Dep't of Hous. & Community Affairs</u> v. <u>The Inclusive Communities Project, Inc</u>., 135 S. Ct. 2507 (2015) (<u>Inclusive Communities</u>), for disparate impact claims under the FHA leaves a number of questions unanswered.  Our understanding is that the Court's call for "adequate safeguards," including a "robust causality requirement," <u>id</u>. at 2523, indicates a higher burden for disparate impact plaintiffs under the FHA than under Title VII.  Contrast <u>Swierkiewicz</u> v. <u>Sorema N.A</u>., 534 U.S. 506, 511 (2002) (plaintiffs need not plead prima facie case to survive motion to dismiss under Title VII); <u>Lopez</u> v. <u>Commonwealth</u>, 463 Mass. 696, 712 n.20 (2012) ("Statistical data, which generally is the source of evidence of disparate impact, will be required at later stages of the proceedings . . . but is not required at the pleading stage" [citation omitted]).  The Court justifies such a heightened pleading requirement by surmising that "prompt resolution of these cases is important."  <u>Inclusive Communities</u>, <u>supra</u> at 2523.

A handful of courts have interpreted the pleading requirements imposed by the Court in <u>Inclusive Communities</u>. Each one has subjected the disparate impact claims to the rigorous prima facie consideration called for by the Supreme Court.  See, e.g., Merritt <u>vs</u>. Countrywide Fin. Corp., U.S. Dist. Ct., No. 09-cv-01179-BLF (N.D. Cal. Sept. 17, 2015) (allowing plaintiffs to amend complaint after dismissal for failure to show disparate impact or to identify specific policy that causally links to alleged disparity); Ellis <u>vs</u>. Minneapolis, U.S. Dist. Ct., No. 14-cv-3045(SRN/JJK), slip op. at 21 (D. Minn. Aug. 24, 2015) (dismissing disparate impact claim because "allegations of a statistical disparity alone are insufficient to make out a prima facie case" without causal link between challenged policy and disparity, particularly because lack of "factual support[] that [plaintiffs] have been prevented from renting any of their units or that any tenants have been displaced"); Los Angeles <u>vs</u>. Wells Fargo & Co., U.S. Dist. Ct., No. 2:13-cv-09007-ODW(RZx), slip op. at 28 (C.D. Cal. July 17, 2015) (allowing defendant's motion for summary judgment on plaintiffs' FHA claims).

iv.  Application to the present case.  The fair housing statutes make it unlawful to "make unavailable or deny[] a dwelling to any person because of race, color, religion, sex, familial status, or national origin," and bar discrimination "against any person in the terms, conditions, or privileges of . . . rental of a dwelling . . . because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. §§ 3604(a)-(b).  See G. L. c. 151B, § 4 (6), (7), and (11).  Based on the Supreme Court's pleading requirements, the plaintiffs must meet a "robust causality requirement" in order to show that a policy by the defendants created a disproportionately negative statistical discrepancy in available housing for members of a protected class.  See Inclusive Communities, 135 S. Ct. at 2523; 42 U.S.C. §§ 3604(a)-(b); G. L. c. 151B, § 4 (6), (7), and (11).  The plaintiffs have failed to satisfy such pleading requirements.

The plaintiffs' housing discrimination claims are applied to two classes of individuals, the current tenants (with project-based subsidies before the HAP lapsed) and the prospective tenants (whether or not they are on the waiting list).  The claim for the current tenants boils down to two facts:  (1) the defendants' decision not to renew their project-based Section 8 subsidy contract has denied and will deny or

withhold housing from current low income tenants; (2) such tenants are disproportionately members of protected classes.

The plaintiffs have not sufficiently pleaded disparate impact discrimination as to the existing tenants at Burbank. Indeed, the amended complaint does not set forth any harm to plausibly suggest an entitlement to relief. See Flagg, 466 Mass. at 26-27. All of the tenants previously enjoying the Section 8 project-based subsidies were deemed eligible for enhanced vouchers, which not only allow them to remain in their apartments at Burbank, but also to choose to live at another property while still receiving Section 8 benefits. The plaintiffs have not pointed to anything other than speculative prospective harm to these tenants. See part 2.a, supra. The suggestion that at some point in the future rents might increase beyond the level covered by the enhanced vouchers, or, because enhanced vouchers are subject to rescreening, some tenants might be found ineligible at some point in the future, is inadequate to state a claim under Mass. R. Civ. P. 12 (b) (6).

The claim that the defendants' decision disproportionately disadvantaged the prospective tenants is also tenuous. This claim likewise is premised on two facts: (1) the prospective tenants on the waiting list are disproportionately members of protected classes; (2) without the benefit of project-based subsidies, the prospective tenants will almost invariably not be

able to afford to live in the sixty-seven project-based subsidized units in which they might at some point in time have had the chance to live absent the defendants' decision. The claim presents two problems. First, it is speculative and indefinite. There is no guarantee that any of the individuals on the waiting list would have had the opportunity to take advantage of the Section 8 housing at Burbank even if the project-based HAP was renewed; prospective tenants' eligibility to move into the sixty-seven project-based units does not necessarily mean they would actually, at some point in the future, have such an opportunity. Indeed, the complaint offers no facts, beyond bare "labels and conclusions," Iannacchino, 451 Mass. at 636, quoting Twombly, 550 U.S. at 555, that, even if those sixty-seven units did become available in the future, the prospective tenants who are members of a protected class would have the opportunity to move in. Second, and more importantly, the allegations do not meet the "robust causality requirement" in showing that the defendants' actions resulted in a statistical disparity, thereby supporting a claim that the defendants disproportionately disadvantaged members of a protected class. See Inclusive Communities, 135 S. Ct. at 2523. In the present case, it is apparent that, as of April 1, 2011, when the project-based subsidy ended, more tenants inhabiting Burbank units were eligible for Section 8 subsidies (129) than

ever before (sixty-seven when the project-based subsidies ended). There were, then, more low and middle income tenants (who, based on the plaintiffs' statistics, are disproportionately members of protected classes) eligible for federally subsidized Section 8 housing (whether the enhanced vouchers are as beneficial as the project-based subsidies or not) because of the defendants' decision. The plaintiffs therefore have not shown that the defendant's decision not to renew their HAP has resulted in a disproportionately negative impact on members of protected classes, and, in any event, they cannot meet the robust causality requirement necessary to satisfy a prima facie disparate impact claim.

The effect of the defendants' decision not to renew the project-based subsidies is therefore distinguishable from the "heartland" cases of disparate impact liability, id. at 2522, in which the defendant's actions unfairly function to "exclude [members of protected classes] from certain neighborhoods without any sufficient justification," id., by, say, demolishing a development and making it wholly unavailable. See Charleston Hous. Auth. v. United States Dep't of Agric., 419 F.3d 729, 733-734 (8th Cir. 2005) (owner's decision to discontinue Section 8 subsidies, prepay mortgage, and demolish building would have been illegal as resulting in disparate impact on existing and prospective African-American tenants). See also Huntington v.

Huntington Branch, Nat'l Assoc. for the Advancement of Colored People, 488 U.S. 15, 16-18 (1988) (overturning zoning law restricting construction of multifamily housing projects to part of town where fifty-two per cent of residents were people of color in town that was ninety-eight per cent Caucasian and four per cent African-American).  It is likewise different from other cases in which the defendant's actions did or would alone have caused a statistical disparity based on membership in a protected class.  See, e.g., Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish, 641 F. Supp. 2d 563, 569, 577-578 (E.D. La. 2009) (invalidating ordinance allowing only "blood relative[s]" to rent housing units in section of city where residents were "88.3% Caucasian and 7.6% African-American").

We are not presented here with a case in which the property owner's actions exacerbated the differences between the project-based and tenant-based subsidies.  The complaint does not, for instance, indicate that the defendants raised the rent for the Burbank units to such a degree that the PHA refused to pay them as unreasonable.  See 24 C.F.R. § 982.507; 42 U.S.C. § 1437f(o)(10)(B) (PHAs allowed to refuse to pay unreasonable rents).  Had the defendants done so, thereby causing a disproportionate disadvantage for tenants of protected classes who had no other means to supplement the rental costs, it is

possible that such actions would have resulted in a complaint that satisfied the "robust causality requirement" necessary to plead a disparate impact liability claim.  Here, however, there is no evidence to show that the tenants occupying the sixty-seven units previously subsidized by project-based Section 8 subsidies are negatively affected by the currently offered Section 8 enhanced vouchers, nor is there any indication that the defendants' decision will lead to a disproportionate disadvantage to members of protected classes living in Burbank, specifically, and the Fenway neighborhood, generally (whether they sought to rent a project-based unit at Burbank or not).

We do not discern any alleged action by the defendants that justifies the imposition of disparate impact liability under the circumstances, as the plaintiffs have not sufficiently pleaded that the defendants' decision will cause any discriminatory effect.  See Inclusive Communities, 135 S. Ct. at 2514, quoting 24 C.F.R. § 100.500(c)(1) (2014).  As a consequence, the plaintiffs have failed sufficiently to plead a prima facie case of disparate impact discrimination under 42 U.S.C. §§ 3604(a) and (b), as well as under G. L. c. 151B, § 4 (6), (7), and (11).

3. Conclusion.  For the foregoing reasons, the allowance of the defendants' motion to dismiss both counts of the plaintiffs' amended complaint is affirmed.

So ordered.